# PAM–TO–PEE *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 211. Argued October 22, 23, 1902.—Decided December 22, 1902.

Where Congress has passed an act giving the Court of Claims jurisdiction over the claims of certain Indians against the United States, and in an action brought under such act a fund has been created and the mode of distribution has been prescribed by the court which established the amount of the fund, and such method has been approved by this court, its disposition in accordance with the course prescribed by the courts must be held a finality. Where the circumstances are as in the case at bar any further relief must be obtained from Congress and cannot be given by the courts.

The jurisdiction of the Court of Claims, as of other courts, extends beyond the mere entry of a judgment to an inquiry whether the judgment has been properly executed.

ON March 19, 1890, Congress passed an act, 26 Stat. 24, giving to the Court of Claims jurisdiction to try all questions arising out of treaty stipulations between the United States and the Pottawatomie Indians of Michigan and Indiana, unembarrassed by reason of any estoppel supposed to arise from the joint resolution of Congress, approved April 18, 1866, or a receipt in full given by certain Pottawatomie Indians under the provisions of that resolution. Under the authority of this act two petitions were filed in the Court of Claims, one on April 14, 1890, in behalf of "the Pottawatomie Indians of Michigan and Indiana," no individuals being named, by John Critcher, their attorney, his authority being, as stated, an "agreement between said Critcher and the business committee of said Indians, dated September 29, 1887," the other on November 5, 1890, by Phineas Pam-to-pee and thirteen hundred and seventy-one other Pottawatomie Indians of Michigan and Indiana, by John B. Shipman, their attorney. On January 8, 1891, these two cases were consolidated, and on June 27, 1892, 27 C. Cl. 403, a judgment was rendered against the United States for $104,626. The claimants in each of the cases so con-

solidated appealed to this court, which on April 17, 1893, affirmed the judgment. 148 U. S. 691. On April 20, 1893, the mandate was filed in the Court of Claims.

While the judgment determined the amount due from the United States it did not determine to how many or which of the various individual plaintiffs, or in what proportion, the amount thus adjudged to be due from the United States should be paid. The Court of Claims, in its opinion, said (p. 414):

"Congress have recognized by the very title of the act a claimant designated as the 'Pottawatomie Indians of Michigan and Indiana,' and under that generic head is to be determined the aggregate right of such claimant, leaving the question of distribution to that department of the government, which by law has incumbent on it the administration of the trust, which in legal contemplation exists between the United States and the different tribes of Indians."

By this court it was stated (p. 703):

"How the moneys so awarded shall be distributed among the several claimants it is not easy for us to say. The findings of the court below, and the contradictory statements of the several briefs filed by the appellants, have left this part of this subject in a very confused condition."

And after quoting the language of the court below we further said:

"On the other hand, it is contended, with great show of reason, by the petitioners who are represented in case No. 1125 (16,842 in the court below), that the question of what Indians are entitled to participate in the fund is one of law, to be settled by the court, and should not be left to clerical functionaries. Our difficulty, in disposing of this part of the subject, is that we have neither findings nor concessions that enable us to deal with it intelligently.

"It is to be observed that the court below found, as a fact (see finding 10), that the average proportion between the Indians who removed west and those who remained was as 2812 of the former to 291 of the latter, and the court used that relative proportion of numbers as a factor in computing the amount due the petitioners.

"The petitioners, however, number 1371 in case No. 1125, but the number represented in No. 1133 (16,473 in the court below) is not precisely stated. It is alleged in the brief filed in behalf of petitioners in case No. 1125 that only 91 Indians are actually represented in case No. 1133, and that the other 200 Indians are among those represented in case No. 1125.

"But these facts are not found for us in any authoritative form. Nor, indeed, would it seem that the court below was furnished with information sufficient to enable it to define what Indians or what number of Indians, entitled to distribution, are represented by the respective attorneys or agents.

"Unable as we are to safely adjudicate this question as between these classes of claimants, we can do no better than acquiesce in the suggestion of the court below, that it is one to be dealt with by the authorities of the government when they come to distribute the fund.

"As these petitioners no longer have any tribal organization, and as the statutes direct a division, of the annuities and other sums payable, by the head, and as such has been the practice of the government, perhaps the necessities of the situation demand that the identification of each claimant entitled to share in the distribution shall be left to the officers who are the agents of the government in paying out the fund. *United States v. Old Settlers*, 148 U. S. 427."

On August 23, 1894, Congress passed an act, 28 Stat. 424, 450, appropriating money for the payment of judgments of the Court of Claims, including therein the amount of this judgment in favor of the Pottawatomie Indians. On March 2, 1895, it passed a further act, 28 Stat. 876, 894, directing the Secretary of the Interior to detail or employ an Indian inspector to take a census and prepare a roll of the Pottawatomie Indians of Michigan and Indiana who were entitled to share in such judgment, and appropriated the sum of $1000 therefor. After an inspector had been appointed under this act, and while he was engaged in taking the census, counsel for the present petitioners, who was counsel for petitioners in the second of the original suits, addressed a communication to the Secretary of the Interior of date July 27, 1895, representing that such cen-

sus by reason of the basis upon which it was ordered would omit many Indians entitled to share in the judgment. Before any further instructions could be given, and in August, 1895, the inspector filed in the Interior Department his report and census. Acting upon the suggestions made in the letter of counsel a new inspector was on February 5, 1896, designated to examine and report upon the claims of any parties other than those already upon the census roll, and upon his report, of date March 14, 1896, making some slight additions, payment of the entire amount of the judgment was made, and made per capita, to all the individuals on the revised list. Thereafter, and on April 22, 1899, these petitioners filed their petition in the Court of Claims, alleging in substance that they were entitled to participate in the sum awarded against the United States, and as they had not received their share of those moneys they prayed a judgment therefor. Upon a hearing the Court of Claims decided against them and on May 20, 1901, entered a judgment, 36 C. Cl. 427, dismissing their petition, from which judgment this appeal was taken.

*Mr. John B. Shipman* for appellants.

*Mr. Special Attorney William H. Button* for appellees. *Mr. Assistant Attorney General Pradt* was with him on the brief.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

There is an apparent hardship in the result of this litigation, but one which we are constrained to believe the plaintiffs are chiefly responsible for, and which can be relieved only by the action of Congress. Two sets of claimants appeared in the former suits, each represented by separate counsel, and after a consolidation the litigation proceeded only so far as to determine the fact of the liability of the government and the extent of that liability, leaving undetermined the individuals entitled to share in the amount awarded against the government or the proper basis of distribution between those so entitled. In the

first of the suits ninety-one Indians were, it is said, represented, while the petition in the second suit set forth the names of 1371 persons whose names and residences were given, and who were alleged to be entitled to share in whatever money should be awarded against the government. The Court of Claims, after finding the amount that was due, in terms declared that it left "the question of distribution to that department of the government, which by law has incumbent on it the administration of the trust, which in legal contemplation exists between the United States and the different tribes of Indians." This court affirmed that decision, and in so doing, after saying that there was nothing in the record which would enable them to identify the claimants, added: "Perhaps the necessities of the situation demand that the identification of each claimant entitled to share in the distribution shall be left to the officers who are the agents of the government in paying out the fund." Such being the final orders in the consolidated cases, proceedings for ascertaining the individual beneficiaries were rightfully had in accordance with the directions then made. It is no argument against upholding that which was done to say that some other and more satisfactory procedure might have been ordered. Possibly it would have been better for the court to have appointed a master and proceeded according to the rules of equity in identifying the beneficiaries of the fund. However, it was not so ordered, and both the claimants and the government were instructed and concluded by the decision in respect to the method of identification.

The mandate of this court was filed in the Court of Claims on April 20, 1893, and on August 23, 1894, Congress passed an act appropriating money for the payment of the judgment. The fund thereby became available for distribution. No action, so far as appears, was taken in the Court of Claims or in the Indian department looking to an identification of the parties entitled to this money until after March 2, 1895. Nearly two years had passed and no effort had been made by the petitioners to establish to the satisfaction of the court or the officers of the Indian department their right to be counted among the distributees of this fund. Obviously these petition-

ers, whose names and places of residence were stated in the second of the original petitions, could if they had seen fit have furnished proofs of identification.

After the passage of the act of March 2, 1895, appropriating $1000 for expenses, an inspector was detailed as agent to take a census and prepare a list or roll. Then for the first time and after he had commenced his work do we hear of any action on the part of these petitioners, and that action consisted wholly of a single letter from their counsel to the Secretary of the Interior. This was the scope of that letter, which was of date July 27, 1895 : The instructions given to the agent were that in taking the census he should be guided by a pay-roll made in 1866, upon which there had been a *pro rata* distribution of money awarded by Congress, and to account for all the Indians whose names appeared upon that roll, and also to enroll all who could furnish proof of being their legal descendants. The letter was a protest against these instructions, calling attention to the fact that there were prior rolls, particularly those of 1843 and 1844, which should be taken into account in preparing the new census or list. The writer also attached a list of the names of some, who, so far as ascertained, were, he stated, heirs of persons named on one or other of these rolls, and of other individuals who were also entitled to enrollment. Apparently before any action was taken by the department upon this protest the agent had returned a list or census roll of those found by him entitled to share in the fund.

Nevertheless the contention made in the letter of counsel having been presented to the Secretary of the Interior, he ruled that those persons should be enrolled who were on any of the rolls made during the years from 1843 to 1866, or descended from one upon those rolls. Thereupon a new agent was appointed and directed to ascertain what additions to the list returned by the first agent should be made under the new rulings. The work of this agent was not fruitful in results, as he only reported the names of two persons entitled to be added to the list or roll. Thereafter one was added by the department, and upon the list thus completed the money was paid out per capita. The number to whom distribution was made, being all included

in the completed list or roll, was 272. This distribution was made during the month of November, 1896, according to the statement of Chief Justice Nott, in delivering the opinion of the court, although there is no specific finding to that effect. The report of the second agent was dated March 14, 1896. No action appears to have been taken by the petitioners intermediate this report in March, and the distribution in November; none indeed until the filing of this petition on April 22, 1899, more than three years after the report.

The fourth finding in the present suit contains this statement:

" None of the Indians, parties in or represented by the present suit, were paid as aforesaid. A large number of them, to wit, 272, whose names are set forth in Schedule A annexed to claimants' request for findings, were descended from Indians whose names were enrolled on the rolls of Indians in Michigan in the years 1843, 1844, and 1866."

But in respect to this finding it was stated by Chief Justice Nott:

"The evidence now produced to establish the fact that 272 of the present claimants are direct descendants of the Indians who were upon the rolls in 1843 and 1844 is not altogether satisfactory to the court, but in the absence of countervailing testimony it may be said to present a *prima facie* case."

So the case stands thus: Congress having referred to the Court of Claims an inquiry whether anything was due to " the Pottawatomie Indians of Michigan and Indiana " by reason of treaty stipulations, nearly fifteen hundred individuals appeared in two suits, subsequently consolidated, claiming that there was a large amount due under those stipulations, and representing that they were the parties entitled to the benefit thereof. The result of that litigation was to determine that a certain amount was due to those Indians, but there being no evidence to identify the individuals who came within the description and were entitled to share in the amount found due, the judgment was simply for a recovery of such amount, and it was specially directed that the identification of the individuals entitled thereto should be left to the officers of the Indian department. After two years had passed without any evidence being furnished by

individuals of their right to participate in the fund, Congress
directed the Secretary of the Interior to appoint an agent to
examine into the matter and prepare a proper roll or list.
While such agent was acting a protest was made by the counsel
in one of those suits against the basis upon which he was pre-
paring the roll.   Although that agent had finished his work
the Secretary of the Interior accepted the suggestion of counsel,
and directed a new agent to examine and report any names
which upon the basis suggested by counsel should be added to
the roll already prepared.   As the result of the reports of these
two agents a roll was prepared containing the names of 272
persons, and the fund was distributed among them.

There is nothing in the record in the way of finding, report
or letter tending to show what efforts the first agent made in
respect to the matter of identification, what course he pursued
or what steps he took, and in respect to the second agent all
that is disclosed is that which appears in his report, which de-
tails at some length his various efforts to secure evidences of
identification of different individuals.   In short, it must be as-
sumed, in the absence of any showing to the contrary, that the
officers of the government acted reasonably, fairly and with all
needed diligence in discharging the duty imposed upon them.
While from the present findings it appears that they made a
mistake, and did not include all who ought to have been in-
cluded as beneficiaries, yet their instructions conformed to the
suggestions of counsel for petitioners, and there is nothing to
show that they did not make a full and honest effort to carry
out those instructions.   Complaint, therefore, must be upon one
of two grounds: Either that the proper course to pursue in the
way of identification was not taken, but that objection comes
too late, for it was concluded by the prior decision; or that a
mistake having been made in the matter of identification the
government must assume all the burden of the mistake and pay
a second time that which it has once paid in pursuance of the
directions of the court.   That is really the contention of the
petitioners.

They were petitioners in one of the original suits, and con-
tend that they were entitled to share in the fund, and that as

the full amount awarded by the court and appropriated by Congress has already been paid to others, they are entitled to a judgment against the government for that which ought to have been paid to them out of the prior appropriation. The Court of Claims finds that of these petitioners 272 ought to have been placed upon the census roll, and were entitled to a share in the fund. The failure to receive their share may be a hardship to these petitioners, but it must be remembered that the method of ascertaining those entitled was prescribed by the court and pursued by the government. Having been so pursued that fund must be considered as properly distributed.

This is not an ordinary judgment at law in which the plaintiff entitled to receive and the defendant bound to pay are both named, and in which the absolute duty is cast upon the defendant to see that the right party is paid, but a case in which the amount of a fund for distribution was determined, and directions made for ascertaining the beneficiaries of that fund. The debtor and the beneficiaries were each interested in the question of identification, and both bound by the conclusion reached in respect thereto if the directions were fully complied with.

To what would any other ruling result? The finding which, evidently, from the opinion of Chief Justice Nott was not very clearly established, that 272, in addition to those already paid, were entitled to a part of the fund, does not conclude other claimants, and if these petitioners should obtain a judgment against the United States, other petitioners might come forward with like claim, and so the government be compelled to pay over and over again, although it had made one payment in compliance with the directions of the court. Further, if there were really more beneficiaries entitled to share in this fund than those who actually received payment, those who were paid received each too much and should return the overplus; and the amount of that overplus would be constantly increased as in successive actions there were added further beneficiaries, for the distribution was, as stated, *per capita*—a mode of distribution contended for by the petitioners. Petitioners seem to assume that, although the government took the course prescribed by the court in ascertaining the individuals entitled to

share in that fund, it assumed all the risk of mistake, however made; and that they could wait until after the government had acted and made the distribution, and that no responsibility rested upon them to furnish evidences of their title. For reasons stated we cannot assent to this view. Where a fund has been created and the mode of distribution prescribed by the court which established the amount of the fund, its disposition in accordance with the course prescribed by the court must be held a finality, and in the case at bar any further relief must be obtained from Congress and cannot be given by the courts.

It is suggested, though not by counsel, that the Court of Claims had no jurisdiction to entertain this action, and that therefore our order should be to reverse the judgment and remand the case with instructions to dismiss for want of jurisdiction. The basis of this suggestion is the contention that the act of March 19, 1890, simply gave to the Court of Claims jurisdiction to determine the sum due the Pottawatomie Indians of Michigan and Indiana, without the power to identify the particular individuals entitled to share in the amount found due, and it is said that this was so decided in the prior case. We do not so understand that decision. The act, so far as material, reads as follows:

" Whereas representatives of the Pottawatomie Indians of Michigan and Indiana, in behalf of all the Pottawatomie Indians of said States, make claim against the United States on account of various treaty provisions which, it is alleged, have not been complied with : Therefore,

" *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Court of Claims is hereby authorized to take jurisdiction of and try all questions of difference arising out of treaty stipulations with the said Pottawatomie Indians of Michigan and Indiana, and to render judgment thereon; power is hereby granted the said court to review the entire question of difference *de novo,* and it shall not be estopped by the joint resolution of Congress approved twenty-eighth July, eighteen hundred and sixty-six, entitled ' Joint Resolution for the relief of certain

Chippewa, Ottawa, and Pottawatomie Indians,' nor by the receipt in full given by said Pottawatomies under the provisions of said resolution, nor shall said receipt be evidence of any fact except of payment of the amount of money mentioned in it."

Two suits were commenced in the Court of Claims, as heretofore stated, and by that court consolidated. In one a certain number of individuals were named as petitioners. In the other it was admitted that ninety-one persons were represented by their authorized attorney, as appeared by agreement between the attorney and their business committee. The court, after consolidating the two actions, proceeded to determine the amount due, and made no finding as to the individuals entitled to share in such amount. But such identification was for want of sufficient evidence to enable the court to determine the question.. This is apparent from the opinion of that court in the present case, for it is said by Chief Justice Nott, in delivering that opinion, " It is unfortunate for some of the claimants in the present suit that the evidence upon which they now rely was not before the court then. . . . The court deemed itself bound by the action of the government in recognizing the parties represented by the former suit (that is, one of the two suits consolidated), and accordingly rendered judgment for them ; but the court did not undertake to determine who the then existing individual claimants were who were entitled to participate in the distribution."

Again, after quoting from the opinion of this court, he said : " At this point, if the former case had been a similar suit in chancery between ordinary litigants, it would have been referred to a master or referee to ascertain and report as to the individual claimants entitled to recover, and the final decree would not have been entered until a coming in and confirmation or correction of the master's report. The Secretary of the Interior, however, seems to have inferred from language in the opinions of the two courts that he was authorized to proceed and ascertain who those Indians were, and to prescribe the methods for so ascertaining and determining the amount to be distributed to each individual claimant." And after referring

to a plea in behalf of these individual claimants on account of their ignorance, added, " but the former case, in which the court might have exercised the discretion of a court of equity and allowed parties to come in even after the decree and assert their rights, is closed; the judgment therein has been satisfied; the claimants stand directly upon their legal rights, and there can not be one law for the intelligent and another for the ignorant."

And this court, in its opinion, used the language quoted in the preliminary statement of fact. It is obvious from these quotations from the opinions that both the Court of Claims and this court understood that the act gave jurisdiction not only to ascertain the amount due, but also to identify the individuals entitled to share therein, and that the failure to find the latter resulted from a lack of evidence—a lack the plaintiffs endeavor in this action to supply.

But even if the language of the prior opinions of the Court of Claims and this court can be tortured into a different construction, still there can be no question of the jurisdiction of the Court of Claims over the present action. The jurisdiction of a court is not exhausted by the mere entry of a judgment. It always has power to inquire whether that judgment has been executed, and the contention here is—and it is the basis of this suit—that the judgment which was rendered in the prior suit has not been executed. It would be an anomaly to hold that a court having jurisdiction of a controversy and which renders a judgment in favor of A against B had no power to inquire whether that judgment has been rightly executed by a payment from B to C. If the Court of Claims had no authority to inquire into the execution of its judgment it was shorn of a part of the ordinary jurisdiction of a court. The question what is essential in order to confer jurisdiction in this court over the judgments of the Court of Claims was exhaustively examined by Chief Justice Taney in *Gordon* v. *United States,* reported in 117 U. S. 697, and that judgment has been more than once referred to by this court as conclusive of the questions therein considered: *District of Columbia* v. *Eslin,* 183 U. S. 62; *District of Columbia* v. *Barnes,* p.    , *post.* In that opinion he said (p. 702):

" The inferior court, therefore, from which the appeal is taken, must be a judicial tribunal authorized to render a judgment which will bind the rights of the parties litigating before it, unless appealed from, and upon which the appropriate process of execution may be issued by the court to carry it into effect. And Congress cannot extend the appellate power of this court beyond the limits prescribed by the Constitution, and can neither confer nor impose on it the authority or duty of hearing and determining an appeal from a commissioner or auditor, or any other tribunal exercising only special powers under an act of Congress; nor can Congress authorize or require this court to express an opinion on a case where its judicial power could not be exercised, and where its judgment would not be final and conclusive upon the rights of the parties, and process of execution awarded to carry it into effect.

" The award of execution is a part, and an essential part of every judgment passed by a court exercising judicial power. It is no judgment, in the legal sense of the term, without it. Without such an award the judgment would be inoperative and nugatory, leaving the aggrieved party without a remedy. It would be merely an opinion, which would remain a dead letter, and without any operation upon the rights of the parties, unless Congress should at some future time sanction it, and pass a law authorizing the court to carry its opinion into effect. Such is not the judicial power confided to this court, in the exercise of its appellate jurisdiction: yet it is the whole power that the court is allowed to exercise under this act of Congress."

It follows from these considerations that the Court of Claims not only had jurisdiction to find the amount due from the United States to the Pottawatomie Indians of Michigan and Indiana and render judgment therefor, but also to inquire into the question whether that judgment had been duly and properly executed.

The judgment is

*Affirmed.*

Mr. Justice White, with whom concurred Mr. Justice McKenna, dissenting.

It results from the findings of the court below that the petitioners in that court who are appellants, apart from the question of their laches, are entitled to the relief which they seek. This was conceded by the court below in the conclusion of law which it drew from the findings of fact, was not challenged by the government in the argument at bar, and is, besides, not now questioned by this court in its opinion. But the lower court held, and this court now affirms such conclusion, that because of their laches the petitioners are cut off from obtaining that judicial relief to which they would otherwise be entitled. In other words, it is decided that although the power exists in the court to grant relief, its duty is not to exert its lawful powers to that end because the petitioners have so neglected their rights that they are not entitled now to enforce them. From this conclusion I am constrained to dissent, because, in my opinion, there is no power in the court to entertain jurisdiction, and therefore no right in it to decide the question of laches. In other words, I think the plaintiffs in error must be relegated to Congress for relief, not because they have lost their right to redress in the courts by their neglect, but because the wrong which they have suffered is one which can only be remedied by Congress, the courts being without jurisdiction over the subject matter. Whilst both in the opinion of the court and in my view the plaintiffs in error can only obtain relief at the hands of Congress, there is a serious difference in the grounds upon which the conclusion proceeds, for manifestly it is one thing to refer the plaintiffs to Congress because they have lost their rights by neglect, and another to refer them to Congress because that body alone has power over the subject. Because of the difference between these views and the effect which this difference may have on the rights of the parties when their claim for relief is presented to Congress, I deem it my duty to state quite fully the reasons for my dissent.

The history of this controversy was stated in the opinion in *Phineas Pam-to-pee* v. *United States*, 148 U. S. 691. For the

purpose of present clearness, however, the salient facts are again recapitulated.

On the 26th and 27th of September, 1833, by a treaty and articles supplementary thereto, the united nation of Chippewa, Ottawa and Pottawatomie Indians ceded certain lands in Michigan and Illinois to the United States, and agreed to remove within three years west of the Mississippi. 7 Stat. 431, 442. Among other payments to be made on account of the cessions, there was to be paid to the Indians under the treaty proper the sum of $280,000, and under the articles supplementary $40,000, in twenty annual installments of fourteen thousand dollars and two thousand dollars respectively.

Appended to the articles supplementary was a provision wherein it was recited :

" As since the signing of the treaty a part of the band residing on the reservations in the Territory of Michigan have requested, on account of their religious creed, permission to remove to the northern part of the peninsula of Michigan, it is agreed that in case of such removal the just proportion of all annuities payable to them under former treaties and that arising from the sale of the reservation on which they now reside shall be paid to them at l'Arbre Croche." 7 Stat. 445.

Only a portion of the Indians embraced by the provision just quoted removed from their reservations to the northern part of Michigan. The others disbursed throughout Michigan and a few settled in Indiana.

From the year 1843 to the year 1865, inclusive, payments were made to the Pottawatomie Indians who had not removed West, and who were deemed to be entitled to the annuity benefits stipulated in the articles supplementary signed on September 27, 1833. These payments were made at the Mackinac agency, and it would seem that the payments embraced Indians who had not removed to the northern part of Michigan, but who had located elsewhere in Michigan and Indiana. A schedule showing the dates of payments, the names of the agents who made them, and the number of Indians to whom the aggregate sums were paid, is annexed in

the margin.[1]  The amounts which were paid, as stated in the schedule, embraced sums deemed to be due under an annuity of sixteen thousand dollars, arising from a treaty made on July 27, 1829, and the annuity of two thousand dollars, mentioned in the articles supplementary of September 27, 1833.

By a treaty signed in June, 1846, 9 Stat. 833, all the Indians (Chippewas, Ottawas and Pottawatomies) embraced in the treaty of 1833, who had removed to the West and retained their tribal organization, were designated as the Pottawatomie Nation.

In accordance with a joint resolution of July 28, 1866, 14 Stat. 370, the sum of $39,000 was paid to the Chippewa, Ottawa and Pottawatomie Indians in Michigan and Indiana.  This sum was paid to the "chiefs, headmen, heads of families, and individuals without families" of the Indians in question, within the Mackinac agency, there being 230 persons falling within the classes above designated, each one of the distributees receiv-

| [1] Year. | Name. | No. paid. | Amount. |
|---|---|---|---|
| 1843 | Robert Stuart........................................... | 253 | $1587.50 |
| 1844 | do      ................................................... | 269 | 1587.50 |
| 1845 | Wm. A. Richmond...................................... | 217 | 1587.50 |
| 1846 | do ·· ................................................. | 204 | 1587.50 |
| 1847 | do   ..................................................... | 244 | 1587.50 |
| 1848 | do   ..................................................... | 260 | 1587.50 |
| ·1849 | Chas. P. Babcock................................... | ·260 | 1587.50 |
| 1850 | do   ..................................................... | 218 | 1587.50 |
| 1851 | Wm. Sprague....................................... | 229 | 1587.50 |
| 1852 | do   ..................................................... | 214 | 1587.50 |
| ·1853 | Henry C. Gilbert.................................. | 219 | 1587.50 |
| 1854 | do   ..................................................... | 236 | 1587.50 |
| 1855 | do   ..................................................... | 236 | 1587.50 |
| 1856 | do   ..................................................... | 221 | 1587.50 |
| 1857 | A. N. Fitch........................................... | 229 | 1587.50 |
| 1858 | do   ..................................................... | ·234 | 1587.50 |
| 1859 | do   ..................................................... | 253 | 1587.50 |
| 1860 | do   ..................................................... | 236 | 1587.50 |
| 1861 | De Witt C. Leach.................................. | 235 | 1587.50 |
| 1862 | do   ..................................................... | 247 | 1587.50 |
| 1863 | do   ..................................................... | 246 | 1587.50 |
| 1864 | do   ..................................................... | 242 | 1237.50 |
| 1865 | Richard M. Smith, principal in currency $1587.50 | | |
|  | ·do    gold premium in currency    692.24 | 232 | 2279.74 |

ing an equal share, that is, $169.50.   The money thus paid was receipted for as in full and complete satisfaction of all payments of every kind and nature, past, present or future, in favor of the persons to whom the payment was made and those by them represented, against the United States or the Pottawatomie Nation of Indians.   Despite the receipt in full thus given, the Indians to whom the payment in question had been made continued to assert a claim against the United States on account of what was alleged to be still due to them under treaty stipulations.   Finally, by the act of March 19, 1890, 26 Stat. 24, the Court of Claims was authorized " to take jurisdiction of and try all questions of difference arising out of treaty stipulations with the said Pottawatomie Indians of Michigan and Indiana, and to render judgment thereon."   It was provided that the payment of $39,000 heretofore referred to should not be given the finality which its terms imported, and appellate jurisdiction over any judgment which might be rendered was conferred upon this court.   The second section of the act reads as follows :

" SEC. 2. That said action shall be commenced by a petition stating the facts on which said Pottawatomie Indians claim to recover, and the amount of their claims, and said petition may be verified by a member of any ' Business Committee ' or authorized attorney of said Indians as to the existence of such facts, and no other statements need be contained in said petition or verification."

Under this act two petitions were filed in the Court of Claims. The first of these petitions was entitled *The Pottawatomie Indians of Michigan and Indiana* v. *The United States ;* the second was entitled *Phineas Pam-to-pee and* 1371 *other Pottawatomie Indians of Michigan and Indiana* v. *The United States.* The right asserted in both of these petitions was based on the averment that the petitioners were entitled to recover a stated sum from the United States, because they had not received their due proportionate share of the annuities or other sums due the Pottawatomie Nation of Indians.   However, although both the petitions substantially stated the same facts as constituting the cause of action, the amount claimed in each petition was widely different.   This arose from the fact that in the first pe-

tition it was asserted that about 300 of the Indians who had not removed West were entitled to their proportionate share of the tribal annuities under the articles supplementary to the treaty of 1833, it being alleged that those who had removed West were about 4000 in number.   The claim was that the distribution should proceed upon that basis; whilst in the second petition it was asserted that the Indians who had not removed West were 1200 in number, and that distribution should be made in the ratio that 1200 bore to 4000, the latter being the number of Indians asserted to have gone West.   Although, however, there was a difference in the claims of the two petitions as to the amount of the indebtedness owing by the United States, in both petitions recovery was only sought of an aggregate sum as due to the Pottawatomie Indians in Michigan and Indiana entitled to take under the articles supplementary to the treaty of 1833, and in neither petition was there any allegation as to the proportionate sum of the total amount claimed to which any particular Indian was entitled, nor did either petition purport to state the representative capacity in which any particular Indian was entitled to take his share of the whole fund, if any.

The two petitions referred to were consolidated and heard together.   The Court of Claims decided that there was due to the Pottawatomie Indians of Michigan and Indiana, after deducting payments made, the sum of $104,626, and entered judgment for that sum.   27 C. Cl. 403, 421.

The " just proportion " which the court thus found to be due to the Pottawatomie Indians of Michigan and Indiana, in the aggregate, entitled to share in the funds of the Pottawatomie Nation, was arrived at first by ascertaining from various reports the number of the Indians who had moved West under the treaty of 1833, and then by ascertaining the number of Indians entitled to share who had remained in Michigan.   This latter number was arrived at by averaging the number of such Indians as shown by various payments made from 1843 to and including 1866, as manifested in the schedule of such payments heretofore excerpted or referred to.

The court was of opinion that under the jurisdictional act of

1890 it could only find and decree the aggregate amount due all the Indians entitled to participate in the fund found due, and that it was not incumbent upon it to determine who were the particular Indians entitled to take such aggregate amount and the distributive share to which each particular Indian was entitled. It said:

"Congress have recognized by the very title of the act a claimant designated as the 'Pottawatomie Indians of Michigan and Indiana,' and under that generic head is to be determined the aggregate right of such claimant, leaving the question of distribution to that department of the government, which by law has incumbent on it the administration of the trust, which in legal contemplation exists between the United States and the different tribes of Indians."

On appeal this court affirmed the judgment of the Court of Claims. 148 U. S. 691. After determining that there was no error in the judgment under review, in so far as it fixed the aggregate amount due, the question was then considered whether it was the duty of the court to ascertain what particular Indian was entitled to share in the fund and the amount of his or her distributive share. On this subject, after quoting approvingly the reasoning of the Court of Claims, by which that court sustained its action under the jurisdictional act of 1890, in finding only the aggregate amount due and leaving the distribution of the fund to the executive officers of the government, and after pointing out that the suit was brought to recover only such aggregate amount, and that there was no finding made by the court below which would justify a decree distributing the fund, the court said (p. 705):

"Unable as we are to safely adjudicate this question as between these classes of claimants, we can do no better than acquiesce in the suggestion of the court below, that it is one to be dealt with by the authorities of the government when they come to distribute the fund.

"As these petitioners no longer have any tribal organization, and as the statutes direct a division, of the annuities and other sums payable, by the head, and as such has been the practice of the government, perhaps the necessities of the situation de-

mand that the identification of each claimant entitled to share in the distribution shall be left to the officers who are the agents of the government in paying out the fund. *United States* v. *Old Settlers, ante,* 427."

By the deficiencies appropriation act of August 23, 1894, 28 Stat. 424, c. 307, various sums were appropriated, " For payment of judgments of the Court of Claims," one item reading as follows: "To the Pottawatomie Indians of Michigan and Indiana, $104,626.00." In the Indian Department appropriations act of March 2, 1895, 28 Stat. 876, c. 188, was contained the following, italics not in the original (p. 894):

" Miscellaneous.

\*     \*     \*     \*     \*     \*     \*     \*

" That the Secretary of the Interior is hereby authorized and directed to detail or employ an Indian inspector to take a census of the Pottawatomie Indians of Indiana and Michigan who are entitled to a certain sum of money appropriated by Congress to satisfy a judgment of the Court of Claims in favor of said Indians. *And for the purpose of making the payment to the Pottawatomie Indians, of Indiana and Michigan,* of the $104,626, appropriated by the last Congress to satisfy a judgment of the Court of Claims, there is hereby appropriated the sum of one thousand dollars."

In the Indian Department appropriations act of August 15, 1894, 28 Stat. 286, c. 290, there was appropriated $6243.90 as the " amount due certain Pottawatomie Indians of Indiana and Michigan " for their proportion due June 30, 1893, June 30, 1894, and June 30, 1895, "of the perpetual annuities ($22,300.00) . . . as ascertained by the judgment of the Supreme Court of the United States pronounced in the case of the Pottawatomie Indians of Michigan and Indiana against the United States, on April 17, 1893, and which annuities were not embraced in the judgment aforesaid." 28 Stat. 295. An appropriation of $2081.30 for the proportion of the perpetual annuities due the Pottawatomie Nation for the year ending June 30, 1896, was made by the Indian Department appropriations act of March 2, 1895, 28 Stat. 876, 885, c. 188. It was recited, as in the previous statute, that the amount of the perpetual annuities

had been ascertained by the judgment of this court on April 17, 1893. By a proviso the Commissioner of Indian Affairs was directed " to withhold from distribution among the said Indians so much of any moneys due them by the United States as may be found justly and equitably due for legal services rendered, and to pay the same on account of the prosecution and recovery of the moneys aforesaid." In the Indian Department appropriations act of June 10, 1896, 29 Stat. 321, c. 398, there was appropriated to pay the same Indians $2081.30 as their proportion of the perpetual annuities for the year ending June 30, 1897, and also the sum of $41,626.00, as a " final settlement by capitalizing their proportion of the perpetual annuities in question." Reference was made to the judgment of this court as in the prior appropriation acts.

· The action of the Secretary of the Interior in respect to the disbursement of the moneys so appropriated is summarized in finding of facts numbered III made by the Court of Claims in this action. It reads as follows:

" In June, 1895, the Secretary of the Interior ordered and directed that a census of the Indians be made under the act 2d March, 1895, 28 Stat. 894. The census roll was prepared under instructions of the Commissioner of Indian Affairs, dated June 8, 1895—approved by the Secretary of the Interior June 15, 1895—by John W. Cadman, and is known as the ' Cadman census roll.' While the agent was so engaged in taking the census, John B. Shipman, Esq., attorney of record in the case of *Pam-to-pee* v. *United States,* addressed a communication to the Secretary of the Interior, dated July 27, 1895, representing that such census, by reason of the manner in which it was being taken, would omit many Indians entitled to be paid under the judgment of the court. Before further instructions were given by the Secretary of the Interior the agent, Cadman, in August, 1895, made and returned and filed in the Interior Department the census so made by him.

" After this roll had been prepared many applications for enrollment were received by the Commissioner of Indian Affairs, based upon the statement that while such applicants were not on the roll of 1866 they were on prior rolls from 1843 to 1866,

or were the descendants of such persons. The question was then submitted to the Secretary of the Interior for an opinion as to whether the rolls from 1843 to 1866 should be considered in connection with the enrollment of those who were entitled to participate in the distribution of the $104,626 awarded by the Court of Claims.

"On January 10, 1896, the Secretary of the Interior made his final decision in regard to the Indians who should be enrolled and paid under the judgment of this court and the appropriation of Congress. Marcus D. Shelby, a special Indian agent, was designated by the Commissioner of Indian Affairs to examine and report upon the claims of the several parties alleging to be descendants of the Pottawatomie Indians of Indiana and Michigan who were permitted by supplemental clause to the treaty of September 27, 1833, to remain east, and for whom the Court of Claims rendered a decision in their favor of $104,626, June 27, 1892. The instructions given to the agent by the Commissioner were dated February 5, 1896. The agent so designated proceeded to Michigan and reported the result of his investigation, bearing date of March 14, 1896. The report so made was accepted by the Secretary of the Interior as substantially correct, and the amount appropriated by Congress in satisfaction of the judgment of this court, 28 Stat. 450, as well as other funds appropriated to pay the Indians upon treaties mentioned in the petitions in said suits, (the sum paid being $118,554.52) paid to the persons upon the roll made by Cadman, after adding thereto two names on the recommendation of Shelby in closing his report as persons mentioned on the census roll of 1866. Later one more was added by the department. The money was paid to the Indians as communal owners. That is to say, it was paid *pro rata* to every living member of that portion of the tribe entitled to participate in the fund and not *per stirpes*.

"Enclosed in the said letter of John B. Shipman was a list containing the names of over one hundred and fifty of the claimants herein, the names of their ancestors and number on the pay-roll of 1843 and 1844 being given as stated in the letter."

The report of agent Shelby was made a part of the findings of the court. The manner in which he proceeded to ascertain who were entitled to be added to the Cadman roll was thus summarized in the opinion below :

" His report to the Commissioner of Indian Affairs, March 14, 1896, shows that he traveled through the country where these Indians resided, or were supposed to reside, and notified them, so far as he could, to appear and prove their cases. In his report he said : ' I found these people very badly scattered, and as they do not frequent post offices, the notices prepared for me to be posted in the various post offices, to give them notice of my coming, were of but little value. In nearly every instance, on reaching the vicinity of these Indians, I had to take teams and drive to their homes. I got, however, the newspapers to publish the principal points I would visit.' A number appeared, some of whom claimed because their ancestors' names were on the rolls of 1843 and 1844, others because they had Pottawatomie blood in their veins. All of these applicants were rejected for various reasons ; some because their proof was insufficient ; some because they or their forefathers had allied themselves with other Indian tribes ; some because their fathers' names had been erroneously placed, in the opinion of Indian agents, upon the former rolls, and had been dropped from subsequent rolls."

There was no finding that any notice had been given to Mr. Shipman of the movements of agent Shelby, nor was it found that any of the Indians whose names were furnished by Mr. Shipman to the Secretary of the Interior ever had actual notice of the investigation which the representative of the Secretary of the Interior made intermediate the receipt of the instructions of February 5, 1896, and the return of Shelby to Washington in the early part of the following month.

On April 22, 1899, the present action was instituted in the Court of Claims, the petition being filed on behalf of Phineas Pam-to-pee and 362 other named Indians, alleged to be a portion of the Indians in whose favor the judgment for $104,626 was rendered. The proceedings in the prior actions were set out and the passage of the various appropriating acts to which

allusion has already been made was averred, as also that distribution had been made of the greater part of the funds among 273 Indians, while nothing had been paid to the petitioners. Judgment was prayed for such proportionate amount of the various funds as the evidence might show the petitioners were entitled to, to be " allotted and awarded to them severally."

After issue joined, the cause was tried and the Court of Claims filed findings of facts and conclusions of law. Finding III has heretofore been set out. Finding IV reads as follows:

" None of the Indians, parties in or represented by the present suit, were paid as aforesaid. A large number of them, to wit, 272, whose names are set forth in Schedule A annexed to claimants' requests for findings were descended from Indians whose names were enrolled on the rolls of Indians in Michigan in the years 1843, 1844, and 1866. A portion of the Indians who remained in Michigan as coming within the exemption of the treaty of September 27, 1833, were represented in both petitions in the cases of the *Pottawatomie Indians* v. *The United States* and the *Pam-to-pee Indians* v. *The United States*."

The Court of Claims thus expressly found that a large number of the Indians, claimants in this suit, had received nothing in the distribution made by the Secretary of the Interior, although some of these Indians were parties to or represented in the consolidated case, and were also represented by Mr. Shipman before the Secretary of the Interior, and were entitled to share in such distribution. In addition, from the facts found concerning the investigation made by Agent Shelby prior to the distribution referred to, the court below expressed the opinion that the investigation by Agent Shelby " was hurried, and to the judicial mind is unsatisfactory." Moreover, the court, considering the judgment rendered in the previous consolidated case and the acts of Congress making the appropriation to pay the judgment of $104,626, arrived at the conclusion that " there is not a line in the judgment of this court or in any statute of Congress which empowered or authorized the Secretary to dispose of the fund." It was decided that the suit must be dismissed, because the petitioners had been guilty of such laches in pressing their claims after the appropriation was made and whilst the distribu-

tion was pending, as to debar them from all right to relief at the hands of the court.

It is difficult for me to determine precisely on what ground the theory of laches was predicated. In one aspect of the opinion below it would seem to have been rested upon the theory that, as the distribution of the money was a judicial act and not an administrative one, it was incumbent on the petitioners to have invoked the power of the court to control the Secretary of the Interior and compel him to distribute the money rightfully; on the other, that although the petitioners had formally notified the Secretary of their claims, they were nevertheless guilty of laches because they did not foresee that that officer would distribute the money without notice to them, and after an investigation which the court itself finds to have been wholly unsatisfactory to the judicial mind.

In the argument at bar the error which was committed in the distribution in question as shown by the facts found by the court below is not disputed. On the contrary, in addition to the error in the distribution so shown, it is expressly conceded that the distribution was besides fundamentally wrong, because it was made on an illegal basis. Thus it is said in the brief on behalf of the United States:

"It appears from the record in this case that the judgment was distributed not *per stirpes* but *per capita*. That is to say, all the Indians discovered were allowed to participate equally in the fund, irrespective of the generation to which they belonged. The son of an Indian who appeared on one of the pay rolls was allowed only the same amount which each of, say, five grandchildren of an Indian on one of the pay rolls was allowed. They should have taken by representation. The aggregate of the five shares of the five grandchildren mentioned should have equaled the share of the son of the original payee. The consequence is that the whole judgment was distributed on a wrong basis. The payments became due to individuals at various times. The record discloses no reason why the estate of the individual to whom such payment was due is not entitled to the whole of such payment.

"If any one on the pay rolls at the time the annuities became

due died without heirs who could inherit, there is no reason why this share should not escheat. It is perfectly evident that a mere enumeration of the Indians, and an equal division among them, does not fulfill the requirements of the situation."

The deduction which the government makes from the admission just quoted being that the petitioners are not entitled to relief, because relief cannot be administered without making parties defendant all those to whom the distribution was made and securing an entire readjustment and settlement of the rights of all parties.

This court now affirms the judgment of the court below. In effect the application of the rule of laches made by the lower court is approved, and the decisive result of the laches is additionally sustained by the conclusion that, although it was not shown that any notice was served upon the petitioners prior to the distribution made by the Secretary of the Interior, the presumption that the officers of the government discharged their duty raises the legal inference that before making the payment such full and fair investigation had been made by the executive officers as warranted the paying out of the money in the manner in which it was disbursed. This court now, moreover, holds that as the judgment in the consolidated case, although it only found the amount due to the Pottawatomie Indians in Michigan and Indiana as a body, had remitted the question of what Indians were entitled to such gross sum to the proper executive department of the government, the executive officers who made the distribution in effect acted under the order of the court.

The jurisdiction to entertain the action can alone be predicated upon the following considerations: First, the act of Congress of 1890, by the authority of which the original judgment in the consolidated case was rendered, or upon the judgment thus rendered; or, second, the appropriation made by Congress to pay such judgment and the acts of Congress in connection therewith.

By section 1066 of the Revised Statutes it is provided that the jurisdiction of the Court of Claims "shall not extend to any claim against the government . . . growing out of or dependent on any treaty stipulation entered into . . . with

the Indian tribes." Clearly, therefore, aside from the jurisdiction conferred by the act of 1890, there was no power in the courts to consider and determine the question of the proper distribution of the funds due the Pottawatomie Nation of Indians, or to fix the just proportion to which the Pottawatomie Indians of Michigan and Indiana were entitled. Now, the act of 1890, which conferred jurisdiction on the Court of Claims to determine the sum due the Pottawatomie Indians of Michigan and Indiana out of the tribal funds, was susceptible of being construed in one of two ways: First, that it alone delegated the power to determine the aggregate amount of the just proportion of the tribal funds due to the Indians in question, or that it conferred such authority, and, in addition, imposed the duty of ascertaining the particular Indians who were entitled to share in the distribution when the total sum for distribution was judicially determined. That the statute embraced only the first power, that is, of fixing the aggregate amount, seems to me to conclusively result from the judgment rendered by the Court of Claims and affirmed by this court. It cannot be doubted that the Court of Claims expressly decided that the authority conferred by the act of 1890 related only to determining the aggregate amount, and not to the ascertainment of the particular persons entitled to share in the same and the amount they were respectively entitled to take. True, this court, in its opinion, in 148 U. S. 691, referred to the absence of evidence as to who were entitled to the distributive shares, and the impossibility of rendering a decree on that subject, yet it nevertheless, in affirming the judgment, expressly approved the conclusion of the Court of Claims limiting the judgment to the determination of the aggregate amount and leaving the distribution of that sum, when Congress should thereafter appropriate therefor, to the action of the executive officers of the government.

It follows that the jurisdictional power conferred by the act of 1890 was exhausted by the decree of affirmance, and the subsequent distribution of the gross sum when the appropriation had been made was solely a matter within the jurisdiction of Congress and the administrative officers of the government.

That such was the legislative conception of the effect of the judgment of affirmance rendered by this court, is conclusively shown by the appropriation to pay the money and the other legislative acts concerning that sum and other sums awarded to the Indians in question, since such acts treat of the ascertainment of the individuals entitled to the gross amount found due as a purely administrative question, with no intimation whatever that it was conceived that the administrative discretion which the acts imposed was subject to be reviewed and controlled by the judicial branch of the government. To repeat, the jurisdiction, under the act of 1890 having been exhausted and the judgment fixing the aggregate sum having expressly remitted the distribution to the administrative branch of the government, it follows that no support for the jurisdiction over the present suit, either in the Court of Claims or in this court, can be founded upon the act of 1890 or the judgment rendered thereunder. Did, then, jurisdiction arise from the act of Congress appropriating the sum necessary to pay the judgment referred to or from the other appropriation acts to which reference has heretofore been made?

From what has already been stated, it would seem that a negative answer must be given to this question. In view of the terms of section 1066 of the Revised Statutes, I think it is clearly requisite that the intention of Congress to commit to the courts the ultimate regulation and control of a distribution *prima facie* intended to be made or expressly directed to be made among unascertained beneficiaries by the executive officers of the government, should be plainly made to appear before it should be held that such authority was conferred on the judiciary. Now there had been no claims presented to Congress on behalf of Pottawatomie Indians seeking individual relief; but the claims urged were on behalf of the whole body of Pottawatomie Indians in Michigan and Indiana, who asserted the non-payment of their just proportion of the tribal annuities. On twenty-four different occasions, during as many years, Congress, through the Interior Department, had ascertained and determined who were the individuals constituting the Pottawatomie Indians of Michigan and Indiana, entitled to a just

proportion of tribal annuities, and neither in the jurisdictional act of 1890 nor in any of the appropriating acts was language used importing that it was deemed that a necessity. existed for a judicial ascertainment of the particular individuals who might possess a right to share in the "just proportion" referred to. The various acts in which the appropriations in question were embodied made provision for numerous other appropriations, in compliance with stipulations embodied in treaties made with sundry Indian tribes, and as in the particular appropriating paragraphs in question payments were merely directed to be made to unascertained individuals constituting a body of Indians, there was certainly no clearly implied or expressed intention that the payments should be subject to the ultimate control of the courts or that the disbursement of the funds should be under any other direction or control than that of the Secretary of the. Interior, who had made prior payments of a similar character upon his own ascertainment of the individual beneficiaries. As a matter of fact, also, a contrary intent is clearly manifested in several of the appropriating paragraphs. Thus, in the act of March 2, 1895, 28 Stat. 894, the duty is expressly imposed on the Secretary of the Interior to take a census of the Indians who were entitled to the fund appropriated by the previous Congress to pay the judgment of $104,626, thus implying that there had not been any provision in the judgment of the Court of Claims or of this court for the ascertainment of such individual beneficiaries; and one thousand dollars was appropriated "*for the purpose of making the payment*," obviously to those who, by a proper performance of the duty imposed on the Secretary of the Interior, should be found to be embraced within the class. So, also, in the same act, 28 Stat. 885, the absolute control which Congress deemed it was exercising for the distribution of the sums found due to the Indians as a body was evinced in the direction to the Commissioner of Indian Affairs "to withhold from distribution among the said Indians so much of any moneys due them by the United States as may be found justly and equitably due for legal services rendered, and to pay the same on account of the prosecution and recovery of the moneys aforesaid." Bearing in mind that the appropriated

sums in question, though a "just proportion," were in fact tribal funds, and that the expenditure of tribal funds is peculiarly regulated by Congress and committed to the Indian Department, Rev. Stat. sec. 2086, *et seq.*, it seems to me beyond reasonable controversy that Congress intended that the ascertainment of the particular beneficiaries entitled to the funds and the distribution among them should be performed solely by its own agencies.

The decision in *United States* v. *Weld*, 127 U. S. 51, is not an authority opposed to the views just expressed. In that case a judgment had been rendered by the Court of Commissioners of Alabama Claims, in favor of certain claimants, and they had received a portion of such judgment. The amount of the gross fund due all claimants had been fixed in the statute, what should be deducted had been specifically declared, and it had also been explicitly provided that the balance which would necessarily result should be distributed to the judgment creditors. The holding of this court was simply that creditors, whose claims against the fund had been adjudicated by the commission provided for in the statute, possessed a right to sue in the Court of Claims to recover their share of a portion of the fund which had been improperly retained by the Treasury Department.

Being of opinion that the judgment below should be reversed for want of jurisdiction, and that the sole remedy of the petitioners lies in an appeal to the fairness and sense of justice of the legislative branch of the government, it would, of course, be out of place for me to discuss the grounds upon which the laches is held to apply. It is manifest, however, that the reasoning by which I have been led to the conclusion that the court was without jurisdiction, if sound, is in absolute conflict with the theory that laches can be imputed to the petitioners because they did not invoke the aid of the court below to control the discretion to distribute the money vested in the Secretary of the Interior by the acts of Congress making the appropriations. This ground of laches being put out of view, the only other theory upon which it can be rested is, that although the petitioners formally presented their claim to the Secretary of the Interior and called his attention to their rights,

they yet lost them because they did not foresee that that officer would, without notice, proceed to distribute the money to the wrong persons and upon a basis which the government now, whether advisedly or not I need not consider, declares to have been absolutely unjust and illegal.

I am authorized by Mr. Justice McKenna to say that he joins in this dissent.

