Howry, J.,
dissenting:
Agreeable as it would be to unite in the result, not only because of the nature of this case, but likewise because of the high character of the counsel claiming fees from the individuals decreed to be entitled to the fund, but under employment from others decreed not to be entitled, I am constrained to state different conclusions, whatever the outcome.
The questions presented relate to the right of the executive officers named in the findings to make the payments set forth. First, to pay under the original decree of this court, as affirmed, from the fund decreed to be paid to the Eastern Cherokees as individuals. Secondly, as to the power and authority of these executive officers to take $147,527.01 from the amount appropriated directly to the Eastern Cherokees as individuals under the two acts of Congress (set forth in the marginα) in discharge of a contract for counsel fees made by the Cherokee Nation, prosecuting its action for the *133 recovery of the money — from which said payment was made — but losing their claim of right to have judgment for itself or to distribute any part of the sum decreed to be paid to the Eastern Cherokees, who were also prosecuting a similar action for themselves at the same time, by and through counsel of their own selection, authorized under an auxiliary act to be employed and to be paid directly by them as individuals under the order of this court.
*134 It is fair to say that if this were a controversy between an aggregation of persons only, each claiming the same fund from a receiver in possession of money due to one or the other litigating body, payment of fees to the attorneys of the losing side (which is essentially payment to the losing side itself) ■would hardly be preferred.
(1) As to the decree. If, from anything said by the appellate court in affirming our decree, this court be precluded from passing upon the action of these executive officers in the matter at issue, then the payment must stand without reference to the efforts of the Eastern Cherokees to have the full sum appropriated applied to their use and in discharge of their contract only. This phase of the matter can be settled only by looking to what this court first decided and then to what the court of last resort affirmed, within its jurisdiction and power to affirm.
The Cherokee Nation obtained judgment for sums which, with interest, aggregated $46,209.63. The Eastern Cherokees as individuals were decreed to be entitled to $1,111,284.70, which, with interest, aggregated $4,892,365.43.
The decree bears date May 18,1905. For the want of jurisdiction there was no allowance by this court of fees to the counsel representing the Cherokee Nation; and because an appeal was being taken the court reserved the allowance of fees and expenses to the counsel of the Eastern Cherokees until the coming in of the mandate of the Supreme Court. The amount decreed to be paid to the Eastern Cherokees as individuals was to be diminished, according to the decree, by such counsel fees “ as may be chargeable against the same under the provisions of the contract with the Cherokee Nation of January 16,1903,” with such other counsel fees as the court should thereafter allow under the provisions of the act of March 3,1903, to the counsel for the Eastern Cherokees. The fifth finding shows that while the court was considering the question of the amount to be allowed in this decree to the attorneys for fees the attorneys representing all the claimants were present, including the attorneys of the Cherokee Nation; and no application was made to the court for the allowance of compensation to the attorneys for the Cherokee Nation out *135 of the sum decreed to be paid to the Eastern Cherokees as individuals. At the same time the attorneys for the Eastern Cherokees protested against any allowance out of item 2 to attorneys of the Cherokee Nation. When we turn to the contract of January 16, 1903, we find that Finkelnburg, Nagel & Kirby and Edgar Smith agreed to represent said nation in the litigation at such a per cent on such amount as should be collected for their clients. Compensation was to be awarded to the nation’s counsel out of moneys collected for the nation.
That contract could have no other meaning. On its face the scope and authority for the payment of fees by the Cherokee Nation is shown to be “ for the securing payment by the United States of any ¡judgment that may be recovered by the said nation against the United States,” necessarily excluding payment from a fund not recovered by the Cherokee Nation.
True, there was incorporated in the decree the statement that so much of the above-mentioned items or amounts as the Cherokee Nation had contracted to pay as counsel fees, under and in accordance witK the provisions of sections MOS to 0106, both inclusive, of the Revised Statutes, should be left with the Secretary of the Interior to pay. But that statement was not a designation of any fund from which the allowance shoiild be made. Nor was it a direction to pay the' amount named in the contract. Nor was it an approval in advance of such action as the Secretary might take. It was not a direction certainly that the Secretary should invade the fund which, according to the contract, the counsel for the Cherokee Nation had neither collected nor earned. The amount subsequently paid by the executive officers was not a sum chargeable under the provisions of the contract with the Cherokee Nation. It was a direction to the Secretary of the Interior to pay according to the sum collected for the nation (pursuant to the terms of their contract) and not for the sum collected by the attorneys representing an antagonistic interest to the nation.
The Supreme Court, in affirming the case against the United States, left the decree as it was in respect to counsel *136 fees and costs. There being nothing in the decree directing the executive officers to pay from any particular fund nor any specific amount, the appellate court did not undertake to do more than leave the decree where the trial court placed it, because the court of last resort is “ always and only an appellate court except in the limited class of cases where the court has original jurisdiction.” (United States v. Perrin, 131 U. S., 58; B. & O. R. R. v. Interstate Commerce Comm., 215 U. S.)
The supplemental petition does not now seek to open the original decree, but does complain of proceedings subsequent to the affirmance; that is, that too much has been paid and from the wrong fund. Upon any appeal to be taken from what the court now decides such appeal must take up for examination only the proceedings subsequent to the mandate. (Stewart v. Saloman, 97 U. S., 362.)
Believing that the mandate has not been properly interpreted, and that full scope and effect has not been given to it, because the appellate court did not intend to approve a payment that had not been made or to direct that the executive officers could invade the funds of the successful litigant to discharge the contract of the unsuccessful party in full, the question is open for this court now to say that the Secretary of the Interior exceeded his authority in directing payment for all the Cherokee Nation agreed to pay to its counsel from the funds decreed to be paid to the Eastern Cherokees.
The contract of the Cherokee Nation with its counsel inured neither to the benefit of the Eastern Cherokees nor yet redounded to the advantage of the Cherokee Nation, except as to that small part of the fund awarded by the original decree to be paid to the nation.
When the mandate of the appellate court came down this court, on May 28, 1906, passed a further decree in which it awarded to the attorneys of the Eastern Cherokees “ a sum equal to 15 per cent of the amount due and payable under the terms of this modified decree to the Eastern Cherokees, to wit, $1,111,284.70, with interest from June 12, 1838, to date of payment ” as reasonable compensation. The amount allowed was $740,555.41, calculated upon the appropriation. *137 Of such sum it was provided that there should first be deducted $18,000, to be paid to Belva A. Lockwood as a reasonable fee for her services rendered in such behalf, and that the remainder for the gross recovery should be distributed among and paid to the attorneys for said Eastern Cherokees (less certain small sums), as follows: To John Vail, 3 per cent, $144,511.08; to Robert W. Belt, 1| per cent, $80,283.92; to Scarritt & Cox, 2 per cent, $96,340.72; to James K. Jones, 1 per cent, $48,170.36; to Matthew C. Butler, 1^ per cent, $72,255.55; to William TI. Robeson, 1-)- per cent, $72,255.55; to Robert L. Owen, 4-J- per cent, $208,738.23.
The sums allowed were not extraordinary or unusual. The court felt justified in carrying out a contract between the Eastern Cherokees and their counsel for the sums allowed, inasmuch as the payment of anything to the counsel engaged was contingent upon recovery, and years had been given to the prosecution of the just demand of the successful parties, not only in this court but in the Supreme Court of the United States as well as in other departments of the Government. The Eastern Cherokees as a body were not only civilized, but contained among them people as intelligent and capable of contracting as anybody, and they were content with the allowance.
But the allowance of 15 per cent was ample, and allowed on the theory that no claim had been made or could be made for any more fees from the funds decreed by the court to belong to the Eastern Cherokees.
Too much was allowed to the attorneys of the Eastern Cherokees if the recitals of the decree justified another payment from the same funds to attorneys representing different parties.
But in fixing the fees the court had a right to assume, and did assume, that the Secretary of the Interior could only fix fees under the authority granted to him under the other contract from such funds as the court had decreed to be payable for the benefit of the nation — reducing the amount of the compensation proportionately to the amount recovered for it.
(2) As to the power and authority of the executive officers to make the payment under the two jurisdictional acts: *138 Under the first act the Eastern Cherokees as a band had the right to contract for the payment of such fees as the Secretary of the Interior might approve payable from the funds recovered, and that right existed without any addition to the provision for the payment of the counsel of the Cherokee Nation. So, the counsel employed by the Cherokee Nation Avould not have been entitled to an allowance by the Secretary of the Interior from the fund recovered, except for such funds as the nation might have been decreed to be entitled to collect exclusive of the subordinate band. The doubts existing as to the meaning of section 68 of the act of July 1, 1902, were completely removed by the act of March 3, 1903, in the provision carefully providing for the payment of such counsel as the Eastern Cherokees should employ. It was not intended by the second act to have fees duplicated by permitting attorneys representing different interests to have compensation from the same fund, but only according to the ■interest of each litigant in the amount recovered.
There is a manifest and irreconcilable repugnancy in' the later statute as to the right of the executive officers to take from the funds of the one party in discharge of the contract of the other party for counsel fees, because the court was directed to enter judgment for “the rightful claimant” by the proviso to the later act. This later act was intended as a substitute for sections 2103 to 2106 of the Revised Statutes as to certain conditions which might arise under the later act. A rule was intended for the payment of counsel different from the rule prescribed by those sections for the use of the real parties in interest whenever they could show that they were the real beneficiaries; and those sections of the first law became inoperative in the event the recovery provided for by the later act ensued. This matter was not called to the attention of either this or the appellate court, and is yet open for consideration in both courts upon the well-settled principle that nothing not called to the attention of the court will operate to prevent further consideration because a point neither made nor discussed nor directly decided can be called binding. (U. S. v. Miller, 208 U. S., 37.) In United States v. Tynen (11 Wall., 88) it was said that when a later act *139 plainly shows that it was a substitute for a former act the later act will operate as a repeal. In King v. Cornell (106 U. S., 395) it was said: “ It is well settled that when two acts are not in all respects repugnant, if the later act covers the whole subject of the earlier, and embraces new provisions which plainly show that the last act was intended as a substitute for the first, it will operate as a repeal.” By the later act mentioned in this case the new law was intended to exclude the antecedent provision respecting counsel fees provided for in the first act, as the more natural if not the necessary inference is that Congress intended the new law to be auxiliary to and in aid of tlie purposes of the old law. (Wood v. United States, 16 Pet., 342; Aldridge v. Williams, 3 How., 9; The Distilled Spirits, 11 Wall., 356; 95 U. S., 191; United States v. Crawford, 41 Fed. Rep., 561; Pana v. Bowler, 107 U. S., 538.)
Different methods of compensation being provided for by the two acts, it seems to me clear that if the Eastern Cherokees had not succeeded in establishing their right to the fund, the counsel employed by the Eastern Cherokees could not have been compensated from funds awarded to the Cherokee Nation. So, conversely, as the Cherokee Nation were not decreed to be entitled, either for themselves or as trustee, to make distribution, their counsel can not in common justice make distribution, their counsel can not in common justice be compensated from the funds decreed to the Eastern Cherokees.
The pleading in the consolidated cases under the two acts shows the reason for the enactment of the two statutes. From the beginning the Cherokee Nation denied the right of th-e Eastern Cherohees to anything. The nation was asserting the unjust claim of the Old Settlers, and had the suit proceeded in the name of the Cherokee Nation only and judgment had been awarded to it generally, not only the Old Settlers, but likewise the Shawnees, Delawares, and freedmen would have had the whole distribution or- at least would have participated in the distribution made by the Cherokee Nation; and the Eastern Cherokees would have been at the mercy of the nation.
• According to an official enrollment in 1902 there were 197 Delawares, 288 Cherokees by intermarriage, and nearly 5,000 *140 black freedmen. An official enrollment, dated May 28, 1906, discloses 27,051 Eastern Cherokees. True, some of tírese Eastern Cherokees had emigrated west, and the Cherokee Nation proposed to give them a share in such distribution as the nation intended to make. But the nation’s method of distribution would have been most unjust, even to such Eastern Cherokees as had come among them. The amended act carefully provided for the Eastern Cherokees — no matter whether they were east or west — that this court should determine to whom the funds should belong. When the issue came to be made the Cherokees, by the replication interposed against the claim of the Eastern Cherokees, denied any accounting on behalf of the Eastern Cherokees at all, with the statement that the nation “ further denies that if it had collected or hereafter shall collect such moneys the same would have been or will be in its hands an implied trust for the benefit of the Eastern Cherokees, exclusively or otherwise.” The denial embraced every Eastern Cherokee for the benefit of the Old Settlers.
The issue between the parties discloses the unfair and unlawful claim of the Cherokee Nation against every Eastern Cherokee in interest. The passage of the subsequent jurisdictional act carried to the courts the positive indication that the Cherokee Nation was a hostile trustee unfit to have anything to do with the distribution of the moneys in dispute. In the entry of the decree the court still further discredited the nominal and moribund trustee by providing for payment wholly different from that contemplated by the first jurisdictional act.
By the act of June 30, 1906 (34 Stats., 664), Congress made an appropriation to pay the amount decreed to the Eastern Cherokees. Later, July 17, 1906, there was certified by the Secretary of the Interior to the accounting officers the statement that the attorneys for the Cherokee Nation were entitled “to receive compensation under their contract, although there was no direction in the act appropriating the money for the amount appropriated to be diminished by the payment of anything under the contract of the Cherokee Nation with Messrs. Finkelnburg, Nagel & *141 Kirby and Edgar Smith. We are therefore remitted to the unauthorized action taken by the Secretary occurring subsequent to the decree, inasmuch as nothing can be taken from an appropriation except in strict conformity with some provision of law. No other mode of payment is legal.
If anything was lawfully paid from the funds of the Eastern Cherokees to the counsel representing the Cherokee Nation, such payment must rest upon professional services actually rendered to the Eastern Cherokees, and not to the Cherokee Nation, and upon the necessity for such services. An examination of the record discloses that all the counsel made the claim that the United States were lawfully indebted under what was alleged to be the Slade and Bender award under certain treaties. And while it goes without saying that counsel should be paid for services properly rendered from the funds of their own clients, it should also go without saying that they should not be paid from funds decreed to belong to somebody else under an act which authorized others to employ their own counsel without providing for division of fees earned by the counsel last employed. Especially is this so, as the pleadings show a denial of the right of any Eastern Cherokee to share in the distribution.
There remains the matter set forth in the findings relating to the application of one Boudinot seeking to restrain the payment of the fee to Messrs. Finkelnburg, Nagel & Kirby and Edgar Smith. July 16, 1906, the claim was first presented for the allowance of fees out of the funds of the Eastern Cherokees; July 17 it was allowed and transmitted to the Treasury Department next day. Boudinot exhibited a bill on that day, but whether before or after the allowance had been transmitted does not appear. The bill prayed for a perpetual injunction. A rule to show cause why a temporary injunction should not be granted was at once issued in the supreme court of the District of Columbia. While this rule was pending, it operated as an injunction. The case was then argued solely on the question as to whether a temporary injunction should be issued restraining the payment of the money until the allegations of the bill or the denials of the *142 answer could be sustained or rebutted by proof taken in the ordinary way according to the practice in chancery. The court discharged the rule and dismissed Boudinot’s bill, thereby denying the prayer for a temporary injunction and the opportunity of complainant to prove his case, although the case had not been submitted to the court on the merits. Complainant was denied the writ and had no opportunity of establishing his right to one, inasmuch as the court had granted the temporary injunction, and complainant would' have been obliged to furnish a bond to pay damages which might arise from the issuance of the permanent writ. As the court had denied the writ there was no loss and consequently no requirement or occasion for an injunction bond. Complainant prayed an appeal within the time allowed by the rules of court from the order dismissing the bill, but the granting of an appeal did not give him an injunction because the court had already refused the injunction. Boudinot prayed an appeal with an approved appeal bond for costs, which was all that was necessary. Meantime the Treasurer of the United States received a protest against the payment of the money until the appeal could be heard, but payment was made about the first of the following month. Had the appeal been prosecuted further the appellate court would have had nothing to pass upon. It does not appear that more than one person undertook to restrain the payment of the money out of the thousands of Eastern Cherokees. And being neither a bill for the collection of money nor the presentation óf a claim for the payment of money, the bill asking for the injunction and the denial of the prayer have no bearing upon the theory of res judicata,, especially as no proof had been taken and the cause had not been submitted on the merits on bill and answer.
The whole question comes back to the right of -this court, with its jurisdiction still existing, to inquire into the rightfulness of the payment. There can be no question, it seems to me, of the jurisdiction of the court to make the inquiry. As said in Pam-To-Pee v. United States (187 U. S., 371), “The jurisdiction of a court is not exhausted by the mere entry of judgment. It always has power to inquire whether that *143 judgment has been executed. * * * It would be an anomaly to bold a court having jurisdiction of a controversy, and which renders a judgment in favor of A against B, had no power to inquire whether that judgment has been rightly executed by a payment from B to 0.” The supplemental petition merely seeks relief from the mistake of the trustee in making a payment alleged to be wrongful. This court yet having jurisdiction should inquire into it and decide the matter subject to review by the Supreme Court of the United States.
I am authorized to state that Booth, J., concurs in this dissent.

 Jurisdiction is hereby conferred upon the Court of Claims to consider, examine, and adjudicate, with a right of appeal to the Supreme Court of the United States by any party in interest feeling aggrieved at the decision of the Court of Claims, any claim which the Cherokee tribe, or any band thereof, arising under treaty stipulations, may have against the United States, upon which suit shall be instituted within two years after the approval of this act; and also to examine, consider, and adjudicate any claim which the United States may have against said tribe or any band thereof. The institution, prosecution, or defense, as the case may be, on the part of the tribe or any band of any such suit shall be through attorneys employed and to be compensated in the manner prescribed in sections 2103 to 2106, both inclusive, of the Revised Statutes of the United States, the tribe acting through its principal chief in the employment of such attorneys, *133 and the band acting through a committee recognized by the Secretary of the Interior. The Court of Claims shall have full authority, by proper orders and process, to make parties to any such suit all persons whose presence in the litigation it many deem necessary or proper to the final determination of the matter in controversy, and any such suit shall, on motion of either party, be advanced on the docket of either of said courts and be determined at the earliest practicable time. (Sec. 68, act July 1, 1902, 32 Stats., 726.)
Section 68 of the act of Congress entitled “An -act to provide for the allotment of the lands of the Cherokee Nation, for the disposition of town sites therein, and for other purposes,” approved July 1,1902, shall be so construed as to give the Eastern Cherokees, so called, including those in the Cherokee Nation and those who remained east of the Mississippi River, acting together or as .two bodies, as they may be advised, the status of a band or bands, as the case may be, for all the purposes of said section: Provided, That the prosecution of such suit on the part of the Eastern Cherokees shall be through attorneys employed by their proper authorities, their compensation for expenses and services rendered in relation to such claims to be fixed by the Court of Claims upon the termination of such suit, and said section shall be further so construed as to require that both the Cherokee Nation and said Eastern Cherokees, so called, shall be made parties to any suit which may be instituted against the United States under said section upon the claim mentioned in the House of Representatives Executive Document No. 309 of the second session of the Fifty-seventh Congress; and if said claim shall be sustained in whole or in part the Court of Claims, subject to the right of appeal named in said section, shall be authorized to render a judgment in favor of the rightful claimant, and also to determine as between the different claimants, to whom the judgment so rendered equitably belongs, either wholly or in part, and shall be required to determine whether, for the purpose of participating in said claim, the Cherokee Indians who remained east of the Mississippi River constitute a part of the Cherokee Nation or of the Eastern Cherokees, so called, as the case may be. (Act Mar. 3, 1903, 32 Stats., 996.)