HANNAHVILLE INDIAN COMMUNITY,
Forest County Potawatomie Community,
Potawatomie Indians of Indiana and
Michigan, Inc., et al.

v.

The UNITED STATES.

No. 28.

United States Claims Court.

May 17, 1983.

Robert C. Bell, Jr., New Canaan, Conn., for plaintiffs.

David L. Katz, Washington, D.C., with whom was Acting Asst. Atty. Gen. Anthony C. Liotta, Washington, D.C., for defendant.

## OPINION

WILLI, Senior Judge.

Plaintiffs, discrete bands of Potawatomie Indians residing in Michigan, Indiana, and Wisconsin, brought this action before the Indian Claims Commission (the Commission) in 1948. In 1951, without significant activity in the interim, they amended their petition to assert the claim that now consti-

tutes the whole of the suit and is the subject of this opinion *viz,* that an accounting would establish, first, that plaintiffs had been wrongfully deprived of certain annuities and other payments lawfully due them under 12 treaties concluded by the Potawatomie and the United States between 1795 and 1846 and, second, that various disbursements made to certain third parties pursuant to one or more of those treaties were improper. Finding 1, *infra.*

Over the years 1952 through 1956 the General Accounting Office (the GAO) prepared a comprehensive audit report on each of the treaties involved. As the individual reports were completed they were furnished to plaintiffs and to the Commission. Finding 2, *infra.*

During the 20 years that followed plaintiffs' receipt of the audit reports they took no substantive action before the Commission, their entire effort over that period having been directed to applying for and obtaining enlargements of time to act. Findings 4–7, *infra.* In these circumstances defendant, on July 15, 1976, applied to the Commission for an order requiring plaintiffs to specify their exceptions to the GAO audit reports within 90 days, on pain of dismissal for failure to do so. Defendant accompanied its motion with another complete set of the reports in question. On September 2, 1976 the Commission ordered plaintiffs to file their exceptions within 90 days. Finding 8, *infra.* Throughout an ensuing period of almost 2 years plaintiffs did nothing but apply for and obtain a series of enlargements to respond to the Commission's order. Findings 9–15, *infra.*

With its demise impending and its order in this cause still outstanding (the then-pending enlargement running to June 26, 1978), the Commission transferred the case to the United States Court of Claims on May 8, 1978. 41 Ind.Cl.Comm. 304.

On June 27, 1978 plaintiffs applied for a 6-month enlargement, to December 26, 1978, within which to respond to the 90-day order originally entered by the Commission on September 2, 1976. Over defendant's

opposition, plaintiffs were allowed until October 2, 1978 to file their particularized exceptions to the GAO reports with the proviso that to the extent not challenged by that date such reports would be deemed true and correct for all subsequent purposes of the proceeding. Finding 17, *infra*.

On September 26, 1978, by the attorney who had been their attorney of record in this matter since at least 1963, plaintiffs filed a response, styled a "partial response" to the Commission's order. Because of the quoted qualification, and in keeping with the court's express disapproval of the entertainment of serialized exceptions to GAO audit reports, *Navajo Tribe of Indians v. United States*, 224 Ct.Cl. 171, 179–80, 624 F.2d 981, 985 (1980), a memorandum order was issued September 27, 1978 noting the conditional nature of plaintiffs' submission, declaring the unacceptability of the submission on that account, and affording plaintiffs until October 10, 1978 to withdraw the proffered submission and replace it with a revised version represented as complete provided that, on failure of such withdrawal, the submission filed by plaintiffs would be deemed their full and complete statement of exceptions to the GAO reports. On October 4, 1978 plaintiffs filed a paper adopting the 41-page paper filed September 26, 1978 as their response to the Commission's order and, by an order entered the following day, the understanding that the response was complete in itself was confirmed. Findings 18, 19, *infra*.

At that juncture counsel expressed serious and seemingly realistic intentions of achieving a settlement of the suit. When it appeared that settlement was unlikely, the case was set for trial. Findings 22, 23, *infra*.

At the outset of trial the court denied, as without merit, plaintiffs' motion to have the court conduct an investigation of their claims. Finding 26, *infra*.

At the trial plaintiffs called one witness, Mr. Paul K. Gillis, who appeared as an expert on accounting in Indian matters. Mr. Gillis testified that he had examined the subject GAO reports in a cursory man-

ner; that he had not been retained by plaintiffs and that he could not specify any error in the reports. Finding 24, *infra*. Plaintiffs' other evidence consisted of the 41-page statement of exceptions previously mentioned herein, a reply to defendant's response to that statement, and documentary evidence of plaintiffs' counsel's retainer.

Defendant's proof consisted of the GAO reports, the testimony of a witness authenticating them and a response to plaintiffs' exceptions thereto.

With no countervailing proof adduced at trial, the factual details of governmental conduct under the treaties in suit are taken as recorded in the GAO reports. The conclusions that follow therefore result from an evaluation of each of plaintiffs' several claims in light of the facts disclosed in those reports, considered in the context of the subject treaty provisions, relevant statutes and precedent.

Prior to 1833 the Potawatomie Tribe (known as the Potawatomie Nation after 1846) held title to vast lands east of the Mississippi generally comprising northwestern Ohio, northern Indiana, southwestern Michigan, northeastern Illinois, and southeastern Wisconsin. In that year, in furtherance of a federal policy of extinguishing Indian title to lands east of the Mississippi, the Treaty of Chicago, 7 Stat. 431, was concluded. By it the Tribe ceded all of those lands, approximately 5,000,000 acres, to the United States in return for a similar sized tract in the Territory of Iowa and various monetary considerations including certain annuities. The Treaty, which also confirmed the continued viability of the Government's annuity obligations to the Tribe under various earlier treaties dating back to 1795, 7 Stat. 49, specified that the Indians were to remove themselves to the new reservation west of the Mississippi within 3 years. The removal stipulation was partially relaxed by Articles Supplementary, adopted the following day, permitting those members of the Tribe opposed to emigration on religious grounds to relocate in northern Michigan with the proviso that those who remained in Michigan were

to receive their "just proportion" of all annuities payable to the Tribe under the Treaty of Chicago, its Articles Supplementary, and all earlier treaties. Finding 27, *infra.*

As it developed, some tribal residents of Michigan and Indiana remained in southern Michigan and were undisturbed there by the federal authorities even though their presence there was not sanctioned by either the Treaty or its Articles Supplementary. Finding 28, *infra.* It is the descendants of those Indians who comprise one segment of the present plaintiffs—the Potawatomie of Michigan and Indiana. The other, the so-called Wisconsin Band, consists of descendants of those members of the Tribe who failed to remove to the new reservation in the West by dispersing in northern Wisconsin, thereby successfully evading federal efforts to apprehend and forcibly relocate them. The claims of these two groups will be addressed consecutively.

For reasons undisclosed, no annuity payments were made after 1835 to those Potawatomie who remained in Michigan. They protested to Congress which responded in 1866 with passage of a Joint Resolution authorizing payment of $39,000 in full satisfaction of all annuity claims, past, present and future, of the Potawatomie of Michigan and Indiana. That sum was paid in due course. Finding 29, *infra.*

Still dissatisfied, the Potawatomie of Michigan and Indiana again petitioned Congress. The result was passage of a jurisdictional act in 1890 directing the Court of Claims, without regard to the relief mentioned above, to hear and determine "all questions of difference arising out of treaty stipulations with the Potawatomie Indians of Michigan and Indiana." Finding 29, *infra.*

Two suits were instituted in the Court of Claims pursuant to the Act, one on behalf of 91 Indians said to come within the religious exemption feature of the Articles Supplementary to the Treaty of Chicago and the other on behalf of 1,372 Potawatomie who had simply remained in Michigan without benefit of treaty authorization but without objection by the federal authorities.

The court consolidated the cases for trial and ultimately held that the plaintiffs, collectively, were entitled to recover $104,626, leaving the matter of apportionment of that award among individual plaintiffs to the Secretary of the Interior. In addition, the court declined to commute to present value those perpetual annuities that were involved, holding that it lacked authority to do so. *Potawatamie Indians v. United States,* 27 Ct.Cl. 403 (1892). Finding 30, *infra.*

Following Supreme Court affirmance of the above decision Congress appropriated $156,658.50 in full satisfaction of the Court of Claims' judgment and in commutation of the plaintiffs' "just proportion" of all perpetual annuities to which the Tribe was entitled. The Interior Secretary took a census of eligible tribal members and in accordance with its result distributed the appropriated funds among 272 individuals. Finding 31, *infra.*

The 272 distributees included none of the 1,372 plaintiffs in the second of the two consolidated suits decided by the Court of Claims. Those individuals thereupon brought a second suit in the Court of Claims, contending that they were erroneously excluded from the Secretary's census enumeration. The court denied relief on grounds of laches, *Phineas Pam-To-Pee v. United States,* 36 Ct.Cl. 427 (1901), and the Supreme Court affirmed, *Pam-To-Pee v. United States,* 187 U.S. 371, 23 S.Ct. 142, 47 L.Ed. 221 (1902). The plaintiffs then petitioned Congress to award them $78,329.25, exactly one-half of the amount appropriated in satisfaction of the earlier Court of Claims judgment. In 1904 the amount requested was appropriated and paid. 33 Stat. 210–11, Finding 32, *infra.*

◼ By reason of the legislative and judicial actions recounted above, it must be concluded that the Potawatomie of Michigan and Indiana have received all annuities due them under the Treaty of Chicago. Their present claims are therefore foreclosed by the principles of res judicata and accord and satisfaction.

The Potawatomie who evaded federal authorities by dispersing in northern Wisconsin also claim wrongful deprivation of their fair share of annuities payable under the Treaty of Chicago. No such payments had been made to members of the Wisconsin Band because the Secretary of Interior took the position that their failure to remove to the new reservation worked a forfeiture of their right to share in the annuities provided by the Treaty. Finding 33, *infra*.

In 1903 the Wisconsin Band petitioned Congress for ascertainment of their proportionate share of annuities payable under the Treaty of Chicago and related treaties. Finding 34, *infra*.

In 1906 Congress ordered the Secretary of Interior to conduct an investigation directed to an enumeration of the Wisconsin Band and to ascertainment of the Band's proportionate share of annuities that had not been paid. In 1908 the Secretary advised Congress that the unpaid portion of annuities due the Wisconsin Band amounted to $447,339. Congress first adopted that figure in a 1913 appropriations act and consistently adhered to it over the following 15 years during which period it appropriated a total of $447,339 for the Wisconsin Band. The parties are agreed that, as contrasted with that total appropriation the Wisconsin Band actually received $446,781.51 in payment of the "proportionate share" due. Accordingly, the Band is entitled to recover the difference—$557.49. Finding 35, *infra*.

Certain of the annuities underlying the $447,339 balance certified by the Secretary of Interior in 1908 as then due the Wisconsin Band were perpetual in nature.

In 1908 Congress directed the Secretary of Interior to undertake negotiations with Indian tribes generally looking to commutation of all perpetual annuities then outstanding. Among the agreements concluded by the Commissioner of Indian Affairs pursuant to that mandate was one with the Potawatomie Tribe of Kansas and Wisconsin calling for the payment of $180,758 as the commuted value of perpetual annuities aggregating $9,037.90 per year. That agreement was duly ratified by the Wisconsin Band and the commuted value was appropriated and paid. Finding 36, *infra*.

Accordingly, except for the $557.49 discussed above, the United States has fully discharged all annuity obligations owing the Wisconsin Band.

As partial consideration for the Potawatomie lands ceded by the Treaty of Chicago two trust funds were established for the Tribe's benefit; one of $70,000 for education and encouragement of the domestic arts and another of $150,000 to provide for agricultural improvements and necessary support skills and facilities. Both funds were to be administered in the President's discretion. Findings 27, 37, *infra*. In practice, the corpus of both funds were invested in various interest-bearing obligations until 1880 when Congress authorized the Secretary of Interior to deposit all such trust funds with the United States Treasury, to be held there at interest subject to the future needs of the Tribe in the areas for which the funds were created. In 1907 Congress clothed the Secretary of Interior with authority to distribute proportionate shares of these to any individual Potawatomie that he deemed competent to manage his own affairs. Finding 37, *infra*.

Over the years there was in all $923,841.80 distributed from the two funds described above and the parties are agreed that none of that distribution went to the Wisconsin Band or its individual members. The parties also agree that the ratio of 457 to 3,523 represents the Band's "just proportion" of the funds so distributed. Finding 38, *infra*. That proportion amounts to $119,174.30 for which the Band is entitled to judgment.

The evidence shows, and defendant acknowledges that the Wisconsin Band is also entitled to recover (1) $389.16 as its proportionate share of a $1,000 annuity payable under the Treaty of August 3, 1795 but not paid in 1813, 1814, or 1815, Finding 47, *infra* (2) $545.72 as its proportionate share of an unpaid teacher subsidy provided by the

Treaty of August 29, 1821, and (3) $415.10 as its proportionate share of an unpaid annuity due in 1837 under the Treaty of September 20, 1828 and of an annual subsidy for tobacco, iron and steel due under provisions of the same Treaty but unpaid in both 1835 and 1837. Finding 48, *infra.*

Included in plaintiffs' exceptions to the GAO audit reports are various contentions that have been duly considered and found to be without merit.

■ In those exceptions, filed October 5, 1978 (Finding 19, *supra*) plaintiffs, for the first time, cite eight additional treaties as grounds for recovery on an assortment of claims. Those claims are uniformly time-barred by virtue of Sec. 12 of the Indian Claims Commission Act. 60 Stat. 1049, 1052. Finding 39, *infra.*

Plaintiffs' exceptions also assert entitlement to a share of unexpended funds appropriated pursuant to the treaties in suit and returned to the Treasury on surplus warrants. Plaintiffs have failed to show that any treaty obligation went unfulfilled because of the nonexpenditure of any part of those surplus funds. The claim is therefore without merit. *Seminole Nation v. United States,* 316 U.S. 286, 293, 62 S.Ct. 1049, 1053, 86 L.Ed. 1480, 86 L.Ed. 1777 (1942); *Shoshone Tribe of Indians v. United States,* 82 Ct.Cl. 23, 85–86 (1935).

Plaintiffs' exception to the payment of money or cession of land to various individual third parties in implementation of the treaties in suit is not well taken because each such payment or cession was expressly sanctioned by a treaty provision. Findings 41, 42, 46, *infra.*

■ Of course, to the extent that plaintiffs challenge disbursement of funds to other tribes, with no showing or suggestion that the funds involved were theirs, they lack standing. Finding 42, *infra.*

■ Finally, plaintiffs are not entitled to interest on any of the recoveries awarded herein, in the absence of any statute or treaty authorizing the same. *United States v. Mescalero Apache Tribe, et al.,* 207 Ct.Cl. 369, 518 F.2d 1309 (1975).

For the reasons stated above, the claims of the Potawatomie of Michigan and Indiana will be dismissed and judgment of $121,081.77 will be entered for the Wisconsin Band.

## FINDINGS OF FACT

1. This suit was commenced before the Indian Claims Commission (the Commission) on May 4, 1948 by a petition filed by certain organized, existing and recognized bands of the Potawatomie Nation residing in Michigan, Wisconsin and Indiana. The relief sought is an accounting for annuities and funds provided by various specified treaties with the United States. Those treaties are:

| | |
|---|---|
| August 3, 1795 | 7 Stat. 49 |
| September 30, 1809 | 7 Stat. 113 |
| October 2, 1818 | 7 Stat. 185 |
| August 29, 1821 | 7 Stat. 218 |
| October 16, 1826 | 7 Stat. 295 |
| September 20, 1828 | 7 Stat. 317 |
| July 29, 1829 | 7 Stat. 320 |
| October 20, 1832 | 7 Stat. 378 |
| October 26, 1832 | 7 Stat. 394 |
| October 27, 1832 | 7 Stat. 399 |
| September 26, 1833 | 7 Stat. 431 |
| September 27, 1833 | 7 Stat. 442 |
| June 17, 1846 | 9 Stat. 853 |

Plaintiffs conceded at trial that the last enumerated of the above treaties is not involved in this proceeding.

2. At various times during the years 1952 through 1956 the General Accounting Office (GAO) prepared an audit report for each of the treaties involved in this litigation. Each report comprised a transactional history of implementation of the treaty to which it relates. As these reports were completed, over the period indicated, they were provided to plaintiffs and to the Commission.

3. Since October 17, 1963, at the latest, plaintiffs' attorney of record in this litigation has uniformly been Robert C. Bell, Jr., Esquire.

4. Following issuance of the GAO audit reports described in Finding 2, *supra,* plain-

tiffs took no action before the Commission with respect to either those reports or any other merits aspect of this case until September 24, 1970 when, in response to a Commission order setting the case for trial on October 20, 1970, they filed a motion for a 90-day enlargement of the trial setting, until January 18, 1971. In support of the relief requested, plaintiffs' motion represented:

> Docket No. 28 is essentially an accounting proceeding. *Paul J. Gillis,* certified public accountant especially qualified and experienced in Indian Claims matters, 5454 Wisconsin Avenue, N.W., Washington, D.C. 20015, *has been and presently is engaged in the preparation and analysis [o]f material* for the petitioners to indicate among other things that moneys of the petitioners were spent for tribes other than the petitioners, that some moneys were returned to the United States Treasury, that some moneys were spent by the defendant for its own purposes, that some moneys were spent without regard to the terms of the several treaties, that some moneys were invested but no accounting made for either principal or income of said investments, that excessive prices were paid for annuity goods, that (as shown by Exhibit A annexed to defendant's "Answer to Amended Petition") the defendant in 1909 and on other occasions made settlements which purported to be across the board settlements with all Potawatomies which in fact did not constitute such. The items to be considered are many, voluminous and extend over a period of many years. Additional time is necessary for such. (Emphasis added.)

5. On December 18, 1970 plaintiffs applied to the Commission for an additional six-month enlargement of the trial date from January 18, 1971, representing in part:

> Much accounting work on Government and other records is required and remains to be done.

By an order of January 13, 1971 the Commission extended the date for trial to April 20, 1971.

6. On April 2, 1971 plaintiffs filed a further motion with the Commission, this time asking that the case be removed from the trial calendar until a final decision was rendered by the Commission defining the political structure of the Potawatomie Nation as consisting of either a single entity or an aggregation of discrete and independent political units. The motion was allowed by a Commission order of April 14, 1971.

7. By a decision of March 28, 1972 the Commission determined that the Potawatomie Nation was a single land-owning entity. 27 Ind.Cl.Comm. 187. On December 18, 1974 that determination was affirmed on appeal. *Potawatomie Nation of Indians v. United States,* 205 Ct.Cl. 765, 507 F.2d 852 (1974).

8. On July 15, 1976, no further action having been taken before the Commission in the case since its removal from the trial calendar to await the decisions referenced in the preceding finding, defendant filed a motion with the Commission to compel plaintiffs, within 90 days, to specify their grievances with the GAO audit reports under pain of dismissal of the action for their failure to timely do so. In conjunction with that motion defendant served plaintiffs and filed with the Commission duplicate copies of the GAO audit reports described in Finding 2, *supra.* On September 2, 1976 the Commission entered its order on that motion, directing plaintiffs to "file within 90 days from the date of this order or by Tuesday, November 30, 1976, specific exceptions, if they have any, to any item or items of the General Accounting Office reports filed in this case together with full particulars and reason therefore [sic]."

9. On November 26, 1976 plaintiffs filed a motion for a 90-day extension of time, until February 28, 1977, to comply with the Commission order described in the preceding finding. In the absence of objection by the defendant the Commission allowed plaintiffs' motion by an order of December 15, 1976.

10. On February 25, 1977 plaintiffs filed a motion for an additional 60-day enlargement of time, to April 29, 1977, to comply with the Commission order referenced in Finding 8, *supra*. Without objection by defendant, the Commission allowed the motion by an order of March 16, 1977.

11. On April 28, 1977 plaintiffs filed a motion for an additional 60-day enlargement of time, to June 28, 1977, to respond to the Commission order detailed in Finding 8, *supra*. Without objection by defendant, the Commission allowed the motion by an order of May 19, 1977.

12. On June 20, 1977 plaintiffs filed a further motion for an additional 90-day enlargement of time, to September 27, 1977, to respond to the Commission order described in Finding 8, *supra*. Without objection by defendant, the Commission allowed the motion by an order of July 13, 1977.

13. On September 19, 1977 plaintiffs filed still another motion for an enlargement of 90 days, to December 25, 1977, to respond to the Commission's order referenced in Finding 8, *supra*. Without objection by defendant, the Commission allowed the motion by an order of October 6, 1977.

14. On December 20, 1977 plaintiffs moved the Commission for a further extension of 90 days, to March 25, 1978, to respond to the order entered September 2, 1976. Finding 8, *supra*. Without objection by defendant, the Commission allowed the motion by an order of January 6, 1978.

15. Finally, on March 2, 1978 plaintiffs filed their last motion for enlargement before the Commission; this time for an additional 90 days, to June 26, 1978, for compliance with the order entered September 2, 1976. Finding 8, *supra*. Without objection by the defendant, the Commission allowed the motion by an order of April 13, 1978.

16. Pursuant to Pub.L. No. 94–465, 90 Stat. 1990, the Commission transferred this action to the United States Court of Claims on May 8, 1978. 41 Ind.Cl.Comm. 304.

17. On June 27, 1978 plaintiffs filed a motion for a six-month further enlargement of time, to December 26, 1978, to comply with the Commission's 90-day order of September 2, 1976. The defendant opposed allowance of the motion and by a memorandum order of August 2, 1978 the trial judge allowed an enlargement to October 2, 1978. The order provided:

IT IS THEREFORE ORDERED that to the extent that by October 2, 1978 plaintiffs have not filed specific exception, accompanied by full particulars and supporting reasons, to any item appearing in the accounting reports prepared by the General Accounting Office, which reports are appended as Exhibits A through P to defendant's MOTION FOR EXCEPTIONS OR FOR SUMMARY JUDGMENT filed with the Indian Claims Commission on July 15, 1976, such item will be deemed established as true and correct for all subsequent purposes of this proceeding.

18. On September 26, 1978 plaintiffs' attorney tendered the clerk for filing a 41-page document styled REPLY TO MOTION FOR EXCEPTIONS OR FOR SUMMARY JUDGMENT. Under the caption CONCLUSION the following statement appeared in that document: "The foregoing is a partial response to Defendant's Motion for Exceptions, which should be supplemented as Plaintiffs' accountants are able to review pertinent records." Viewing the qualifications implicit in the quoted language as the attachment of unacceptable conditions on acceptance of the proffered document, the trial judge issued a memorandum order on September 27, 1978. The narrative portion of that order explained the basis for the action taken as follows:

There is no warrant in either reason or in the rules of this court for countenance of an open-ended, serialized response to a motion for summary judgment even though judgment is sought by way of sanction for failure of a party opponent to comply with an order that has been outstanding against it for more than 2 years.

The defendant cannot properly be required to expend its time and resources on the preparation of a detailed response

to the content of a submission that is labeled by its proponent as partial and subject to supplementation of an undefined nature at unspecified times in the future. Given the stated qualifications, the tendered document is in reality not a reply to a motion but an application for additional time to make such a reply.

The purpose of this order is to clarify in advance the status and significance of the proffered document should it be accepted for filing.

For the reasons stated above, the order directed:

IT IS THEREFORE ORDERED that unless, by October 10, 1978, the plaintiffs withdraw from the custody of the clerk the document (and all copies thereof) lodged with him on September 26, 1978 he will, on that date, file the same as plaintiffs' full and complete response to the order of the Indian Claims Commission to which said document is addressed. Should the document be so filed, it will be deemed as compliance with the undersigned's order of August 2, 1978, and the defendant shall have 30 days after filing to respond thereto, following which plaintiffs shall have 15 days for reply.

IT IS FURTHER ORDERED that should plaintiffs elect to withdraw the subject materials from the custody of the clerk they shall do so with the understanding that they remain subject to the terms of the undersigned's order entered in this cause on August 2, 1978, provided, however, that the date for compliance therewith will be October 10, 1978 rather than October 2, 1978, as originally provided in said order.

19. On October 5, 1978 the trial judge entered a memorandum order supplemental to that described in the preceding finding, stating in relevant part as follows:

On October 4, 1978, plaintiffs' attorney of record tendered the clerk for filing a 3-page document captioned RESPONSE TO ORDER OF TRIAL JUDGE ON SEPTEMBER 27, 1978 UNDER RULE 13(a). On page 3 of that paper it is said: "We reaffirm our 'Reply to Motion for Exceptions or for Summary Judgment' submitted September 26, 1978, as being responsive to Defendant's motion and do not wish to withdraw the same." In view of the explicit terms of the order of September 27, 1978, this affirmative declination to withdraw the document lodged with the clerk on September 26, 1978, is deemed to constitute that document as plaintiffs' full and complete response to the order of the Indian Claims Commission to which the document is addressed and, accordingly, their compliance with the undersigned's order of August 2, 1978.

IT IS THEREFORE ORDERED that, treated as an affirmative designation of their submission of September 26, 1978, as their compliance with the trial judge's order of August 2, 1978, as provided in the trial judge's further order of September 27, 1978, plaintiffs' RESPONSE TO ORDER OF TRIAL JUDGE OF SEPTEMBER 27, 1978 UNDER RULE 13(a) shall be forthwith filed by the clerk for that purpose and that purpose only.

IT IS FURTHER ORDERED that the 41-page document entitled REPLY TO MOTION FOR EXCEPTIONS OR FOR SUMMARY JUDGMENT lodged by plaintiffs with the clerk on September 26, 1978, is to be forthwith filed by the clerk as plaintiffs' full and complete compliance with the undersigned's order of August 2, 1978.

IT IS FURTHER ORDERED that to the extent that plaintiffs' submissions of September 26, 1978 and October 4, 1978, may be deemed to constitute motions for enlargement of time to comply with the undersigned's order of August 2, 1978, such motions are DENIED.

IT IS FURTHER ORDERED that, in accordance with the provisions of the undersigned's order of September 27, 1978, the defendant shall have 30 days to respond to plaintiffs' REPLY TO MOTION FOR EXCEPTIONS OR FOR SUMMARY JUDGMENT, filed this date, and plaintiffs shall have 15 days thereafter to reply to defendant's response.

20. On February 6, 1979, following a series of enlargements duly applied for and allowed, defendant timely filed the response authorized it by the supplemental order described in Finding 19, *supra.*

21. On April 24, 1979, after two enlargements applied for and allowed, plaintiffs filed the reply authorized by the supplemental order described in Finding 19, *supra.*

22. Under date of June 6, 1980 the trial judge addressed the following letter to plaintiffs' attorney:

To date I have refrained from setting this matter down for trial because of your verbal assurances as to the imminent likelihood of consummation of a settlement. As I understood it, your most recent advice was to the effect that specific terms of settlement had been endorsed by two of the three interested tribes. While I wish to afford the parties every reasonable opportunity to adjust their differences voluntarily, I believe that we have now exceeded the limits of reasonable deferral and am therefore proposing that the matter be set down for trial to commence on a day agreeable to counsel during the week beginning July 14, 1980. Counsel should consult among themselves and advise me of their mutual preference as to location, date and hour for commencement of the trial. Upon receipt of that advice, I will issue a formal notice of setting.

Please respond to this communication at your earliest convenience.

23. Having heard nothing from plaintiffs' attorney in the meantime, on June 18, 1980 the trial judge addressed the following letter to the parties' counsel:

This acknowledges receipt of defendant's letter of June 13, 1980, advising me of the planned retirement of its attorney of record on August 31, 1980 and, therefore, requesting that this case be set down for trial in the latter part of July failing consummation of the pending settlement by that time.

I believe that an examination of the history of this case, coupled with the inevitable disruption that will attend withdrawal from the case of defendant's attorney of record, provides a completely rational basis for the trial schedule that defendant suggests.

As yet, I have received no response from plaintiffs to my letter of June 6, 1980. I, therefore, propose that trial be scheduled to commence in Washington on either July 14 or July 21, 1980 and continue day-to-day until concluded. I will refrain from fixing the specific setting for a period of 10 days in order to permit counsel to agree on either of those two dates as mutually acceptable. Failing a consensus on that score within the next 10 days, I will proceed to fix a firm trial date.

24. Trial of this action was held at Washington, D.C., on July 29, 1980. Plaintiffs called one witness, Mr. Paul K. Gillis, the same individual referenced in Finding 4, *supra.* Whereas plaintiffs represented to the Commission, without the knowledge of Mr. Gillis, that in September 1970, he was then actively engaged in preparing analyses of exceptions to the GAO audit reports (Findings 2, 8, *supra*), he testified as follows when asked whether he had ever examined the reports (Tr. 28–29):

I have looked at these reports in a cursory manner, Your Honor. I have not gone behind the records. I have not been employed by the tribe. I will not work for any tribe without a written contract and I don't have one so I have done nothing more. I did for Mr. Bell what I did for all tribal attorneys who came to me. I look at the report in a cursory manner which means anywhere from several hours to a day or two and I advise whether or not I think there is some basis for proceeding, what those areas might be and the steps involved in them. That was the extent of the work if any. There was no charge involved, no contractual arrangement.

JUDGE WILLI: I take it implicit in that then, addressing Mr. Clubb's point, you are not prepared at this time to point to any specific portion of the reports that

you gave this cursory examination and say that there is error?

THE WITNESS: No, I am not, sir.

\* \* \* \* \* \*

The evidence otherwise adduced by plaintiffs consisted of their Reply to Motion for Exceptions or for Summary Judgment, filed October 5, 1978 (Finding 19, *supra*), their Reply to Defendant's Response of February 6, 1979 concerning Motion for Exceptions or for Summary Judgment, filed April 24, 1979 (Finding 21, *supra*), and various contracts of employment establishing the authority of Robert C. Bell, Jr., Esquire, to represent plaintiffs in this proceeding.

25. Defendant's evidence consisted of the GAO audit reports previously supplied plaintiffs and filed with the Commission (Findings 2, 8, *supra*), Defendant's Response to Plaintiffs' Reply to Motion for Exceptions or for Summary Judgment, filed February 6, 1979 (Finding 20, *supra*), and the testimony of a representative of the General Services Administration, functional successor to GAO in the area of Indian trust accounting, who authenticated the GAO audit reports. At the trial defendant acknowledged that certain plaintiffs (the Wisconsin branch) had not received their proportionate share of annuities due them under the Treaty of 1833.

26. Immediately following his opening statement at trial, plaintiffs' attorney proffered a Motion for Investigation Under Section 13(b) of the Indian Claims Commission Act (25 U.S.C. § 70*l*). That section provides:

> The Commission shall establish an Investigation Division to investigate all claims referred to it by the Commission for the purpose of discovering the facts relating thereto. The Division shall make a complete and thorough search for all evidence affecting each claim, utilizing all documents and records in the possession of the Court of Claims and the several Government departments, and shall submit such evidence to the Commission. The Division shall make available to the Indians concerned and to any interested Federal agency any data in its possession relating to the rights and claims of any Indian.

After opportunity for argument, the motion was denied in open court for the stated reason that neither Pub.L. No. 94–465, 90 Stat. 1990, which terminated the existence of the Commission on September 30, 1978 and authorized transfer of its caseload to the United States Court of Claims, nor Pub.L. No. 95–69, 91 Stat. 273, transferring enumerated powers of the Commission to the Court of Claims for disposition of the cases transferred to it, made the provisions of Section 13(b) of the Indian Claims Commission Act applicable to proceedings before the Court of Claims.

27. The first major treaty to which the Potawatomie Tribe (which became the Potawatomie Nation by virtue of the Treaty of 1846, 9 Stat. 853) was a party was that of August 3, 1795, 7 Stat. 49, confirming in them and other named tribes title to lands generally comprising northwestern Ohio, northern Indiana, southwestern Michigan, northeastern Illinois and southeastern Wisconsin. The tribal parties to the Treaty ceded various described lands to the United States and collectively received in return a perpetual annual annuity, payable in goods, of $20,000 of which the Potawatomies' designated share was $1,000. 7 Stat. at 51.

Between 1795 and 1832 the Potawatomie were parties to nine different treaties specified in Finding 1, *supra*. By those treaties they ceded various described lands to the United States and received in return annuities of various amounts and durations, four of them being perpetual.

In 1830 the United States adopted a policy of extinguishing Indian Title to all remaining lands east of Mississippi. To that end, on September 26, 1833, by the Treaty of Chicago, 7 Stat. 431, the United Nation of Chippewa, Ottawa and Potawatomie Indians ceded to the United States approximately 5,000,000 acres along the western shore of Lake Michigan in return for a similar sized tract west of the Mississippi, in the Territory of Iowa, and other considerations in kind and in cash, including $280,000

payable in 20 annual installments of $14,000 each, and $70,000 to establish a fund to be invested by the President to provide educational opportunity and encouragement of the domestic arts for the benefit of the Indians. The Indians were to remove immediately from the portion of the ceded territory lying within the State of Illinois and from the remainder within three years. Article 4th of the Treaty provided that those Indians who moved west during the three-year period were to receive "a just proportion" of all annuities payable thereafter to be distributed west of the Mississippi to those who had removed there.

On the following day, September 27, 1833, Articles Supplementary to the Treaty of Chicago were adopted. 7 Stat. 442. An additional 164 sections of land located east of Lake Michigan, lying south of the Grand River and extending to the Indiana line. In consideration of that cession the Indians inhabiting the land involved were to receive, in addition to participation in all rights extended by the Treaty of Chicago, $100,000 payable in part for certain designated purposes and otherwise consisting of a 20-year annuity of $2,000 per annum. As in the case of the main Treaty, the Indians were to remove from the ceded lands within three years.

An addendum to the Articles Supplementary was set forth in a separate document of the same date (September 27, 1833). 7 Stat. 444. After reciting the delivery to the Indians, and acceptance by them, of a portion of the goods and provisions specified as consideration for lands ceded by the Articles Supplementary, the document relates that since the signing of the Articles Supplementary "a part of the band" inhabiting the ceded lands in Michigan requested that, on account of their religious creed, they be permitted to remove to the upper peninsula of Michigan, rather than to the west. The document reflects approval of this request and specifies that in case of such removal the Indians involved are to receive their "just proportion" of all annuities due them under former treaties, the Treaty of Chicago and the Articles Supplementary; such amounts to be paid at L'Arbre Croche.

The Treaty of Chicago and the Articles Supplementary were ratified on February 21, 1835. 7 Stat. 431. Shortly thereafter, on March 3, 1835, Congress appropriated $1,032,689.53 to implement the Treaty. 4 Stat. 780, 790.

28. Despite the specific treaty stipulations concerning relocation, many of the Potawatomie residents of the ceded lands failed to remove themselves—either to the newly created reservation in the west or northern Michigan. Most of those who had resided on the lands ceded by the Articles Supplementary remained in southern Michigan and largely assimilated themselves into the white man's society there. They became known as the Potawatomie of Michigan and Indiana. Those who had resided in northern Wisconsin adopted an essentially nomadic existence, surviving by hunting, fishing, berry-picking and occasionally working in the lumbering industry. Some of that contingent emigrated to Canada and are not involved in this proceeding. The remainder of the former inhabitants of the treaty lands scattered about Michigan, successfully evading the efforts of Federal troops to forcibly remove them to the West.

In disbursing annuities provided by the Treaty of Chicago and its Articles Supplementary the Government did not confine eligibility to those Indians who had either gone to the new reservation in the West or to northern Michigan. For example, no payments were ever made at L'Arbre Croche as specified in the Articles Supplementary, and the one annual payment of $2,000 that was made in discharge of the $40,000 annuity provided in those Articles was made in southern Michigan, apparently at the same place that, through 1835, payments were made to in southern Michigan where, through 1835, payments due under previous treaties were also made. The recipients included some but not all of the Potawatomie residing there and after 1835 no further payments were made except for $1,587.50 annually, from 1843 through 1866, under the Treaty of July 29, 1829. 7 Stat. 320.

By a Treaty of 1846, 9 Stat. 853, the Potawatomie Nation was geographically unified by a substitution of a 30 square-mile reservation in Kansas, together with other consideration, for the 5,000,000 acres in Iowa ceded by the United States in the 1833 Treaty of Chicago, the Indians to remove to the Kansas reservation within two years and to retain all annuity rights extended them under previous treaties. The geographic reunion thereby accomplished conformed with the political unity that had characterized the Potawatomie since 1795. Finding 7, *supra.*

The failure, after 1835, of many of the Potawatomie in Michigan to participate in annuities provided by the Treaty of Chicago and earlier ones precipitated their protest to Congress. The result was passage, in 1866, of Joint Resolution No. 97, 39th Cong., 1st Sess., authorizing payment of $39,000 to the Michigan Potawatomie "in full of all claims in favor of said Michigan Indians against either the United States or said [Pottawatomie] nation of Indians, past, present, or future, arising out of any treaty made with them or any band or confederation thereof, and the annuity now paid to them is to be restored and paid to said nation for the future." 14 Stat. 370.

29. Despite the clear intendment of its language, the Joint Resolution did not extinguish complaint from the Potawatomie who remained in Michigan, both those who had gone north and those who had dispersed in southern Michigan and Indiana. Their continued dissatisfaction culminated in a jurisdictional act of March 19, 1890 directing the Court of Claims to hear and determine, without regard to Joint Resolution No. 97, "all questions of difference arising out of treaty stipulations with the Potawatomie Indians of Michigan and Indiana * * *." 26 Stat. 24.

30. Pursuant to the jurisdictional act, two groups of Indians who had remained in Michigan filed separate suits. *Potawatomie Indians v. United States,* No. 16743, was filed on behalf of 91 Indians who were allegedly covered by the Supplementary Articles addendum dealing with religion. *Phi-*

*neas Pam-To-Pee, et al. v. United States,* No. 16842, assumed to represent the named plaintiff and 1,371 other Indians who had remained in Michigan by evading the removal efforts of the federal authorities. The cases were consolidated and after trial the court decided that the plaintiffs were collectively entitled to recover $104,626 representing their just proportion of monies due them under the 1833 Treaty of Chicago, its supplement, and all prior treaties, less the $75,162.50 that had previously been paid the plaintiffs in No. 16743 pursuant to those treaties and under Joint Resolution No. 97 ($39,000). The court did not, however, apportion the recovery among the individual Indians who brought the suits, leaving the question of distribution to the executive branch and it held that it had no authority to commute to present value those of the annuities that were perpetual. *Potawatamie Indians v. United States,* 27 Ct.Cl. 403 (1892). The Phineas Pam-To-Pee Indians exercised the right of appeal afforded them by the terms of the jurisdictional act and the Supreme Court affirmed both the money judgment entered by the Court of Claims its two holdings concerning (1) executive responsibility for apportionment and disbursement of the judgment fund, and (2) lack of jurisdiction to commute perpetual annuities to present value.

31. In the wake of the Supreme Court's affirmance Congress appropriated funds (1) to satisfy the $104,626 judgment, 28 Stat. 450; (2) to meet the proportion ($2,081.30) of the perpetual annual annuity of $22,300 that was due the Michigan and Indiana Indians for years (1893–1896) subsequent to the Court of Claims decision (28 Stat. 295, 885); and (3) to pay the commuted value ($43,707.30) of those Indians' proportionate share of the $22,300 perpetual annuity that ran to the entire Pottawatomie Tribe. 29 Stat. 330. In all, those appropriations amounted to $156,658.50. In addition, in 1896 Congress directed the Secretary of Interior to commission a census of those Pottawatomie Indians of Michigan and Indiana entitled to share in the proceeds of the judgment entered by the Court of Claims. 28 Stat. 894. The census was taken, result-

ing in the determination that there were 272 eligible recipients, and in November 1896 the fund ($156,650.50) was distributed to them. *Phineas Pam-To-Pee v. United States,* 148 U.S. 691, 13 S.Ct. 742, 37 L.Ed. 613 (1893).

32. The 272 distributees mentioned above did not include any of the 1,371 plaintiffs in *Phineas Pam-To-Pee et al. v. United States,* No. 16842 in the Court of Claims. Finding 30, *supra.* On April 22, 1899, dissatisfied with the distribution made by the Secretary of the Interior, those individuals filed a second suit in the Court of Claims, asserting their right to half of the fund that had been distributed. The court rejected that claim as foreclosed by laches, holding that the plaintiffs had failed to timely identify themselves to the Secretary so that they could have been included in the census enumeration. *Phineas-Pam-To-Pee, et al. v. United States,* 36 Ct.Cl. 427 (1901). Plaintiffs appealed and the Supreme Court affirmed. *Pam-To-Pee v. United States,* 187 U.S. 371, 23 S.Ct. 142, 47 L.Ed. 221 (1902). Following that action the plaintiffs petitioned Congress, seeking $78,329.25, precisely one-half the $156,658.50 appropriated to satisfy the Court of Claims judgment as augmented by the commuted value of perpetual annuities. Finding 31, *supra.* In 1904 Congress appropriated the amount requested as payment in full (33 Stat. 210–11) "for any and all claims which said Indians may have under or by virtue of the treaty and articles supplementary thereto, made with the Potawatomie Indians September twenty-sixth and twenty-seventh, eighteen hundred and thirty-three, and duly proclaimed February twenty-first, eighteen hundred and thirty-five * * *."

33. As earlier noted, Finding 28, *supra,* some of the Pottawatomie successfully evaded removal by Federal authorities, as specified by the Treaty of Chicago and its Articles Supplementary, located in northern Wisconsin. It is their progeny that are identified in this proceeding as the Pottawatomie of Wisconsin, Hannahville and Forest County Communities.

After the Treaty of Chicago and its Articles Supplementary, Federal authorities took the position that the Pottawatomie of Wisconsin had forfeited their right to participate in annuities payable thereunder and under earlier treaties because they had failed to remove themselves, either to the new reservation in the west or to northern Michigan. Congress, however, apparently rejected the idea of an outright forfeiture. An appropriations act of June 25, 1864, 13 Stat. 161, 172, providing funds ($137,293.40) for the subsistence and relocation of Sioux and Winnebago Indians of Minnesota specified that to the extent that such funds were spent on the Winnebago repayment to the Treasury was to be made out of proceeds from the sale of their Minnesota lands:

> [T]o enable the Secretary of the Interior to take charge of certain stray bands of Winnebago and Potawatomie Indians, now in the State of Wisconsin, with a view to prevent any further depradations by them upon the citizens of that state, and for provisions and subsistence, ten thousand dollars: *Provided,* That the proportion of annuities to which such stray bands of Pottawatomies and Winnebagoes would be entitled if they were settled upon their reservations with their respective tribes shall be retained in the treasury to their credit, from year to year, to be paid to them when they shall unite with their said tribes, or to be used by the Secretary of the Interior in defraying the expenses of their removal, or in settling and subsisting them on any other reservation which may hereafter be provided for them.

34. In 1903 the Pottawatomie of Wisconsin petitioned the Senate for ascertainment and payment of their proportionate share of annuities payable under the Treaty of Chicago and related treaties. Sen.Doc. No. 185, 57th Cong., 2d Sess.

35. In response to the petition mentioned above Congress included the following directive in an appropriations act of June 21, 1906, 34 Stat. 325, 380:

> That the Secretary of the Interior be, and he is hereby, directed to cause an

investigation to be made of the claims of the Pottawatomie Indians of Wisconsin, as set forth in their memorial to Congress, printed in Senate Document Numbered One hundred and eighty-five, Fifty-seventh Congress, second session, and to report thereon to Congress at the beginning of the next session thereof, showing on the best information now obtainable what number of said Indians continued to reside in the State of Wisconsin after the treaty of September twenty-sixth, eighteen hundred and thirty-three, their proportionate shares of the annuities, trust funds, and other moneys paid to or expended for the tribe to which they belong, in which the claimant Indians have not shared, the amount of such moneys retained in the Treasury of the United States to the credit of the claimant Indians as directed by the provision of the Act of Congress approved June twenty-fifth, eighteen hundred and sixty-four; if none have been so retained the amount that should have been annually so retained under said law, showing also what disposition has been made of the annuities, trust funds, and other moneys of said tribe, with the amounts and the status of any now remaining to their credit in the Treasury or otherwise. He will also cause an enrollment to be made of said Pottawatomie Indians.

On April 1, 1908 the Secretary of the Interior furnished Congress the report mandated by the above legislation. H.R.Doc. No. 830, 60th Cong., 1st Sess. The report concluded that the proportionate share of annuities due the Pottawatomie of Wisconsin and unpaid, for the period 1838 through 1907, was $447,339.

Congress responded to the Secretary's report with a series of appropriations measures totalling $447,339 and extending over a 15-year period.

First, in the Act of June 30, 1913, 38 Stat. 77, 102, Congress appropriated $150,000 for the purchase of individual land allotments for the members of the "Wisconsin Band of Pottawatomie Indians now residing in the State of Wisconsin and Michigan, * * * said

sum to be reimbursed to the United States out of the appropriation, when made, of $447,339, the said sum last named being the proportionate share of the said Indians in annuities and moneys of the Pottawatomie Tribe, in which they have not shared, * *."

By subsequent legislation *viz* Act of May 18, 1916, 39 Stat. 123, 156–57 ($100,000); Act of March 2, 1917, 39 Stat. 969, 991 ($100,000); Act of May 25, 1918, 40 Stat. 561, 589 ($75,000); Act of June 30, 1919, 41 Stat. 3, 29 ($15,500) and Act of May 29, 1928, 45 Stat. 883, 901 ($6,839) Congress appropriated a total of $297,339—all directed to liquidation of the Wisconsin Band's unpaid proportionate share, as specified in the Act of June 30, 1913, *supra.*

As contrasted with the foregoing appropriations, totalling $447,339, the evidence shows, and the parties agree, that $446,-781.51 was actually disbursed to the Wisconsin Band in satisfaction to the Government's declared indebtedness to them, as evidence by the Act of June 30, 1913, *supra,* of $447,339. Thus, there remains due the difference—$557.49.

36. Various treaties to which the forebearers of plaintiffs herein were parties provided for the payment by the United States of perpetual annuities. Such treaties were those of August 3, 1795, 7 Stat. 49; September 30, 1809, 7 Stat. 113; October 2, 1818, 7 Stat. 185; October 16, 1826, 7 Stat. 295; September 20, 1828, 7 Stat. 317 and July 29, 1829, 7 Stat. 320.

In an appropriation act of April 30, 1908, 35 Stat. 70, 73, Congress authorized the Commissioner of Indian Affairs:

[T]o send a special Indian agent, or other representative of his office, to visit any Indian tribe for the purpose of negotiating and entering into a written agreement with such tribe for the commutation of the perpetual annuities due under treaty stipulations, to be subject to the approval of Congress; and the Commissioner of Indian Affairs shall transmit to Congress said agreements with such recommendations as he may deem proper.

Pursuant to the above authority, the President, on February 10, 1910, sent a message to the Congress whereby he transmitted a series of agreements concluded by the Commissioner of Indian Affairs with various tribes providing for the commutation of those tribes' perpetual annuities. Sen.Doc. No. 358, 61st Cong., 2d Sess. Among those agreements was one with the Pottawatomie Tribe of Kansas and Wisconsin wherein it was agreed that the perpetual annuities established by eleven specified treaties, aggregating $9,037.90 per year, were to be displaced, by way of commutation, by the principal sum of $180,758. The agreements relating to the Pottawatomie were ratified by the Indians after consideration by their councils at Cifford, Wisconsin, Arpin, Wisconsin, and Nadau, Kansas.

Section 29 of an appropriations act of April 4, 1910, 36 Stat. 269, 289 provided in relevant part:

The several agreements concluded with certain Indian tribes hereinafter mentioned, as evidenced by the original papers on file in the office of Indian Affairs and the copies thereof transmitted to Congress by the President and contained in Senate Document Numbered Three hundred and fifty-eight, Sixty-first Congress, second session, for the commutation of their perpetual annuities under treaty stipulations, made in pursuance of the Act of April thirtieth, Nineteen hundred and eight, authorizing the Commissioner of Indian Affairs, subject to the approval of Congress, to negotiate with any Indian tribe for the commutation of perpetual annuities under treaty stipulations, are hereby ratified and confirmed, to wit:

\* \* \* \* \* \*

The agreement with the Pottawatomie tribe of Kansas and Wisconsin dated March sixteenth, Nineteen hundred and nine;

And the Secretary of the Treasury is hereby authorized and directed to place upon the books of the Treasury to the credit of the said tribes, respectively, the sums hereinafter specified, said sums being a capitalization of the perpetual annuities of said tribes on the basis of five per centum, and the same having been accepted by said tribes in the agreements heretofore mentioned in lieu of and as a commutation of said perpetual annuities, to wit:

\* \* \* \* \* \*

The Pottawatomie tribe of Kansas and Wisconsin, one hundred and eighty thousand seven hundred and fifty-eight dollars;

And the Secretary of the Interior is authorized to withdraw said funds from the Treasury for payment to said Indians, or expenditure for their benefit, at such times and in such manner as he may deem proper and under such regulation as he may prescribe.

\* \* \* \* \* \*

As earlier noted, Finding 27, *supra,* by the Treaty of 1846, 9 Stat. 853, the Pottawatomie Indians "desirous to unite in one common country, and again become one people, and receive their annuities and other benefits in common \* \* \*" resolved themselves into a single, unified entity to be known as the Pottawatomie Nation. In light of that action it is not open to the Wisconsin Band to contend that the 1910 agreement to commute the perpetual annuities of the Kansas and Wisconsin Pottawatomie was not binding on them.

37. In addition to the $70,000 education fund previously mentioned, Finding 27, *supra,* the Treaty of Chicago provided the Indians with $150,000 "to be applied to the erection of mills, farm houses, Indian houses and blacksmith shops, to agricultural improvements, to the purchase of agricultural implements and stock, and for the support of such physicians, millers, farmers, blacksmiths and other mechanics, as the President of the United States shall think proper to appoint." 7 Stat. 431, 432.

On April 15, 1835 $69,329.53 of the $70,000 education fund was invested by the Secretary of the Interior in 5% Indiana Bonds. On July 1, 1836 $670.47, the remainder of the $70,000, plus $2,264.09 in

interest earned on the bonds purchased in 1835 was invested in additional bonds of the same type. This investment fund remained active until 1880 with systematic reinvestment of interest and proceeds from the sale or redemption of bonds in the portfolio.

The $150,000 fund previously described was invested and reinvested by the Secretary in generally the same manner as that provided for education.

By an act of April 1, 1880, 21 Stat. 70, Congress authorized the Secretary of the Interior to deposit with the Treasury of the United States, at interest, all funds then held by him as trustee for Indian tribes. He was also authorized to so deposit all funds that he realized in the future from liquidation of investments as he held as trustee for the benefit of Indians. The Secretary exercised this authority with respect to the cash and investments representing the two funds discussed above.

An Act of March 2, 1907, 34 Stat. 1221–22, authorized the Secretary of the Interior, in his discretion, to designate individual Indians who he deemed competent to manage their own affairs to receive their proportionate share of funds on deposit with the Treasury.

38. In all, there was distributed a total of $923,841.80 emanating from the Treaty of Chicago and invested for the benefit of the Pottawatomie Nation. The parties are agreed on the record that the Wisconsin Band received no part of that distribution and are also agreed that the Band's proportionate share of the funds so distributed was in the ratio of 457 to 3,523 or $119,-174.30.

39. At the trial plaintiffs affirmed that the claims asserted herein arise solely out of the 12 treaties enumerated in Finding 1, *supra.* Despite that unequivocal assurance, confirmed by the pleadings, plaintiffs' exceptions, filed October 5, 1978 (Finding 19, *supra*) include grievances relating to eight additional treaties mentioned there for the first time, *viz* the Treaty of June 7, 1803, 7 Stat. 74, the Treaty of July 4, 1805, 7 Stat. 87, the Treaty of August 21, 1805, 7 Stat. 91, the Treaty of November 17, 1807, 7 Stat.

105, the Treaty of August 24, 1816, 7 Stat. 146, the Treaty of September 22, 1836, 7 Stat. 514, the Treaty of September 23, 1836, 7 Stat. 515, and the Treaty of August 24, 1916. All of these claims asserted for the first time long after August 13, 1951, are time-barred by virtue of Sec. 12 of the Indian Claims Commission Act, 60 Stat. 1049, 1052.

■ 40. Plaintiffs take exception to the return, in certain instances, to the Treasury of certain funds appropriated in respect to the treaties in suit. The bare fact, without more, that surplus warrants were issued from time to time is of no significance in the absence of proof, missing here, that some treaty obligation thereby remained unsatisfied. *Seminole Nation v. United States,* 316 U.S. 286, 293, 62 S.Ct. 1049, 1053, 86 L.Ed. 1480, 86 L.Ed. 1777 (1942).

41. Most, if not all, of the treaties on which this suit is founded specify payments of money and, in some instances, grants of land to various named individuals, some of whom were Pottawatomie Indians and the remainder presumably creditors of the tribe. Plaintiffs challenge these benefits bestowed on individuals on grounds of fairness contending that tribal funds and property should be appropriated only to objects benefiting the Tribe or Nation as a whole. Plaintiffs have failed, however, to demonstrate any of these actions were not expressly authorized by the treaty instruments. Their complaints are therefore not redressable in this proceeding.

42. Among the exceptions taken by plaintiffs to the United States' handling of Pottawatomie treaty funds are several instances involving payments to other tribes, *viz* the Miami, Chickasaw, Pawnee, Omaha, Sioux, Winnebago and Ottawa. The evidence shows that in each such instance the funds involved were either not those of the Pottawatomie or, as in the case of the Ottawa under the Treaty of August 29, 1821, 7 Stat. 218, 221, the payment in question was expressly authorized in a treaty to which the Pottawatomie Tribe was a party. To the extent that the funds involved were not

those of the Pottawatomie plaintiffs lack standing to complain and to the extent that payments were made pursuant to a treaty to which they were a party their complaint is without merit.

43. By a treaty of October 27, 1832, 7 Stat. 399, the "Pottawatomies of the State of Indiana and Michigan Territory" ceded to the United States all of their lands in the States of Indiana and Illinois and in the Territory of Michigan, south of the Grand River. As consideration for the cession Article IV of the Treaty provided, in addition to a 12-year annuity of $15,000 annually, $42,000 payable in goods and $27,021 for payment of tribal debts. 7 Stat. at 401:

> The United States agrees to appropriate, for the purpose of educating Indian youths, the annual sum of two thousand dollars, as long as the Congress of the United States may think proper, to be expended as the President may direct.

By an appropriations act of March 2, 1833, 4 Stat. 636, 639, Congress provided $81,521 for implementation of Article IV of the above treaty and thereafter appropriated funds for payment of the determinate annuity and the education fund. Act of June 26, 1834, 4 Stat. 682; Act of March 3, 1835, 4 Stat. 780, 783; Act of June 14, 1836, 5 Stat. 36, 38; and the Act of March 3, 1843, 5 Stat. 612. In addition, by the Act of March 3, 1891, 26 Stat. 989, 997–98, Congress appropriated $80,000, payable to the Citizen and Prairie Bands of Pottawatomie, to liquidate arrearages under obligations imposed by (1) a treaty of October 16, 1826, 7 Stat. 295, 296 (by which the Pottawatomie ceded lands in Indiana); (2) a treaty of September 20, 1828, 7 Stat. 317–318 (by which the Pottawatomie ceded certain Michigan lands); and (3) the $2,000 annual subsidy for education provided under Article IV of the Treaty of October 27, 1832, *supra.*

■ The record reflects that no money was disbursed for education of the Wisconsin Band pursuant to the provisions of the 1832 Treaty while $16,415.16 was disbursed for the Citizen Band for that purpose and $11,430.93 for the Prairie Band for the same. Those actions simply reflect the reality of the Wisconsin Band's nomadic way of life, Finding 28, *supra,* and the opposition of its members to any form of regimentation, including the enrollment of children in school, for fear of apprehension and removal to the reservation in the West, as provided by the Treaty of Chicago. H.Rep.Doc. No. 830, 60th Cong., 1st Sess., p. 17. In these circumstances the Wisconsin Band has no valid claim to monies appropriated for the discretionary educational benefits afforded by the Treaty of October 27, 1832.

44. The GAO audit reports reflect three instances, involving $4,529.65, $2,372.77 and $1,784.86, of appropriated funds unaccounted for in the records of disbursements pursuant to the Treaty of Chicago and various other treaties, including three treaties in September of 1836 that are not involved in this proceeding. Plaintiffs contend that these monies, being unaccounted for, should be restored to them. This contention, made in the absence of any proof or suggestion that any treaty obligation was consequently or otherwise unsatisfied, is without merit.

45. Various entries in the GAO audit reports reflect disbursements made to tribes other than the Pottawatomie, *viz* the Miami, Chickasaw, Pawnee, Sioux, Winnebago and Omaha Tribes. Since the funds involved were not the property of the Pottawatomie plaintiffs have no valid complaint.

46. Plaintiffs except to the payment of funds to various named individuals and for defrayal of removal and exploration expenses. In each instance such payments were expressly authorized by treaty provisions and are therefore not subject to challenge.

47. As consideration for cession of land, the Treaty of August 3, 1795, 7 Stat. 49, 51, awarded various tribes, including the Pottawatomie, perpetual annuities payable in goods. The annual aggregate of such annuities was $9,500 of which the Pottawatomies' assigned share was $1,000. The evidence shows and defendant concedes that this obligation was not met for the years 1813, 1814 and 1815. Plaintiffs agree that

the Wisconsin Band's proportionate share of that $3,000 arrearage is in the ratio of 457 to 3,523. Finding 38, *supra.* Accordingly, the Wisconsin Band is due $389.16 on this item.

48. Article IV of the Treaty of August 29, 1821, 7 Stat. 218, 220, obligated the United States to pay the Pottawatomie $5,000 per year for 20 years and to appropriate $1,000 per year for 15 years for the support of a blacksmith and a teacher. Whereas the cash annuity was fully satisfied, disbursements for the teacher totalled only $3,269.62, the provision for 15-year payment of a blacksmith having been superceded by Article 2 of the Treaty of September 20, 1828, 7 Stat. 317, 318. Treating the 15-year annual subsidy of $1,000 as applicable in equal shares to the blacksmith and the teacher, the payment for the latter was deficient by $4,230.38 ($7,500 less $3,269.62). The defendant agrees that the Wisconsin Band is entitled to its proportionate share (457/3,523) of the deficiency, *viz* $545.72.

Article 2 of the same 1828 treaty obligated the United States to pay the Pottawatomie a perpetual annuity of $2,000 and $1,000 annually for 20 years. The evidence shows, and defendant concedes, that neither of these annuities was paid for 1837. The Wisconsin Band is therefore entitled to its proportionate share (457/3,523), or $389.16, of the $3,000 payment due for 1837.

Finally, the same article of the same treaty required the United States to deliver to the Pottawatomie, in perpetuity, 2,000 pounds of tobacco, 1,500 pounds of iron and 350 pounds of steel.

Article X of the Treaty of June 5, 1846, 9 Stat. 853, 855, substituted an annual cash payment of $300 for the obligation to supply the tobacco, iron and steel mentioned above. That amount would therefore appear to approximate the annual fair value of the merchandise involved for the previous years. The evidence shows, and defendant concedes, that the merchandise was not provided in either 1835 or 1837. The Wisconsin Band is therefore entitled to its pro-

portionate share (457/3,523) of $600, or $25.94.